**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Criminal Action No. 14-57 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| AGUSTIN FLORES APODACA and PANFILO FLORES APODACA, | |
| Defendants. | |

## MEMORANDUM OPINION

The defendants, Agustin Flores Apodaca, also known as "El Nino," "El Barbon," and "El Ingenierio," and Panfilo Flores Apodaca, also known as "Charmin," were indicted separately on two substantively similar counts of conspiring to commit drug trafficking offenses, including distribution of large quantities of cocaine, methamphetamine, heroin, and marijuana, with the intent to unlawfully import those controlled substances into the United States, as charged in Count One, in violation of 21 U.S.C. §§ 959, 960, 963, and 18 U.S.C. § 2; and using, carrying and brandishing a firearm, during and in relation to one or more drug trafficking crimes, as charged in Count Two, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(B)(ii), and 2.[1] At the government's request, over the defendants' objections, the Court consolidated the defendants' criminal cases for trial, *see* Minute Order (dated Jan. 6, 2017), which trial is scheduled to begin on September 18, 2017.

Pending before the Court are twelve pretrial motions filed by each defendant and by the government. These motions are: (1) the defendants' multi-pronged challenges to the

---

[1]      Given the similarity in surnames between the defendants, and alleged co-conspirators, each defendant is referred to by his first name.

government's admission in its case-in-chief of court-authorized interceptions of Panfilo's electronic communications and other co-conspirator statements, including (a) Agustin's Motion to Compel Discovery ("Agustin's Discovery Mot."), ECF No. 40; Panfilo's Motion to Join and Supplement Agustin's Motion to Compel Discovery ("Panfilo's Discovery Mot."), ECF No. 41, and an amendment thereto ("Panfilo's Am. Discovery Mot."), ECF No. 45; (b) the defendants' Joint Motion to Suppress Title III Intercepts ("Defs.' Jt. Mot. Suppress Intercepts"), ECF No. 33; (c) Agustin's Motion *in Limine* to Preclude Introduction of Post-Arrest Title III Intercepts ("Agustin's MIL Preclude Post-Arrest Intercepts"), ECF No. 51; (d) the defendants' Joint Motion for Pretrial Hearing of Admissibility of Alleged Co-Conspirator Statements ("Defs.' Jt. Hr'g Mot."), ECF No. 52; and (e) Agustin's Motion to Enforce the Rule of Specialty ("Agustin's Specialty Mot."), ECF No. 54; (2) Agustin's Motion to Suppress Statements ("Agustin's Suppress Stms. Mot."), ECF No. 48; (3) the defendants' Joint Motion to Dismiss Count Two of Indictments ("Defs.' Count Two Mot."), ECF No. 50; (4) the defendants' separate Motions to Strike Improper Aliases, ECF Nos. 53 and 56; and, finally, (5) the government's Motion to Introduce Co-Conspirator Statements, Other Crimes Evidence at Trial, and Allow Lead Agents at Counsel Table ("Gov't Mot."), ECF No. 55. Following a summary of the relevant factual background proffered by the government in briefing papers, these motions are addressed in the following sequence: Part II discusses three of the defendants' motions challenging the introduction of intercepted communications; Part III addresses Agustin's motion to suppress the statements he made to the U.S. law enforcement agents on two occasions; and, lastly, Part IV discusses the defendants' joint and joined motions to dismiss the firearms charge in Count Two of the indictments and to strike reference to aliases in the indictments. Pending supplemental briefing, the Court reserves ruling on five motions in full or in part: (1) the Defendants' Joint

Motion to Suppress Title III Intercepts, ECF No. 33; (2) Agustin's Motion to Compel Discovery, ECF No. 40; (3) Panfilo's Motion to Join and Supplement Agustin's Motion to Compel Discovery, ECF No. 41, (4) Panfilo's Amended Motion to Join and Supplement Agustin's Motion to Compel Discovery, ECF No. 45; and (5) the portion of the government's omnibus motion seeking admission of intrinsic or other bad acts, under Federal Rule of Evidence 404(b), ECF No. 55.[2]

## I.    BACKGROUND

The government proffers that, based on information provided to the Federal Bureau of Investigation ("FBI") Office in Washington State by a confidential informant ("CI") in July 2010, the FBI was able to identify a distribution cell of a larger Mexican drug trafficking organization ("DTO"), known as the Meza Flores DTO ("MF-DTO"), which was based in Guasave, Sinaloa, Mexico, and worked closely with the Hector Beltran Leyva DTO ("BL-DTO") to traffic tonnage quantities of cocaine, methamphetamine, heroin, and marijuana into the United States for distribution in the states of Arizona and Washington, and elsewhere in the United States. *See* Gov't's Mot. Consolidate Cases for Trial ("Gov't Consolidation Mot.") at 1–2, ECF No. 16. As set forth in the government's affidavit in support of Agustin's extradition from Mexico, the government identified Agustin as a longtime member of the BL-DTO and as the person who introduced his nephew, Fausto Isidro Meza Flores, also known as "Chapo Isidro" ("Chapo Isidro"), into the organization, and also worked with his brother, Salome Flores Apodaca, also known as "Pelon" and "Fino," to distribute cocaine, methamphetamine, heroin, and marijuana into the United States. *See* Agustin's Specialty Mot., Ex. 1 ¶ 5 (Gov't's Aff.

---

[2]    The portion of the government's motion to seat at counsel table the lead case agent, Gov't's Mot. at 38–39, ECF No. 55, is granted as conceded, since the defendants raise no objection to this request "provided the Government's request is limited to this agent." Defs.' Jt. Resp. to Gov't's Mot. at 2, ECF No. 66.

Supp. Extradition of Agustin Flores Apodaca, dated Oct. 9, 2012), ECF No. 54-2. Chapo Isidro is viewed by the government as the leader of the MF-DTO, while his uncles, both defendants Agustin and Panfilo, and Salome, participated in the distribution of illegal drugs from Mexico into the United States. *See* Gov't Mot. at 5. In addition, Agustin's role within the MF-DTO is described by the government as "synthesizing large volumes of methamphetamine form pre-cursor chemicals," while "Panfilo grew and harvested marijuana, and also coordinated logistics for the shipments of narcotics into the United States for the DTO." *Id.* Both Agustin and Panfilo "carried firearms" and "employed armed gunmen for protection," and "were also directly involved in acts of violence including shootouts against rival cartel members and kidnapping individuals who were unable to pay drug debts." *Id.*; *see also* Gov't Opp'n Agustin's MIL Preclude Post-Arrest Intercepts at 2–3, ECF No. 61.

The government attributes three seizures of illegal narcotics in 2010 and 2011 to the MF-DTO. Gov't Consolidation Mot. at 7. First, on September 2, 2010, U.S. law enforcement seized two pounds of methamphetamine in the gas tank of a silver BMW in Utah, after recovering information from a CI that Donato Valle Vega, who owned a used car lot in Centralia, Washington, and Salome had discussed selling narcotics in the Washington area and sending guns to Mexico. *Id.* at 8. Prior to the seizure, the FBI surveilled Vega loading a brown Chevrolet Impala onto a transportation truck, which was subject, on August 2, 2010, to a "sneak and peek" search that revealed approximately USD $56,000 in bundles and two drug ledgers in the Impala. *Id.* Law enforcement observed Salome arrive at the truck. *Id.* On September 1, 2010, two men were observed loading a package into a silver BMW at Vega's used car lot, leading to the traffic stop and recovery of the methamphetamine in the gas tank. *Id.*

Vega subsequently consented to a search of his used car lot in Centralia, Washington, where law enforcement made the second seizure, on September 2, 2010, of thirty-three pounds of methamphetamine and four kilograms of cocaine. *Id*. Vega then, between September 2 and 8, 2010, made consensually recorded calls with Agustin discussing: (1) the purchase of fifty caliber weapons with United States currency, and as a trade for methamphetamine, a deal Agustin said he would call Salome directly to discuss, *id*. at 9; and (2) customers, quantities, and pricing for kilograms of cocaine, which discussions were also recorded with Salome, *id*. On September 14, 2010, Salome tried to sell to a confidential informant of the Drug Enforcement Administration ("CI-2") approximately thirty pounds of methamphetamine and four kilograms of cocaine at a meeting held in Phoenix, Arizona. *Id*. Salome arrived at this meeting in the brown Impala originally surveilled on Vega's used car lot. *Id*.

Finally, on June 10, 2011, Mexican authorities seized 2,800 kilograms of marijuana in Nogales, Mexico, following receipt of information provided by another confidential informant ("CI-3"), who reported being present when Agustin, Panfilo, and Salome discussed "their shared responsibilities for drug trafficking to include money laundering, murder, kidnapping, firearms, and extortion." *Id*. CI-3 met with Agustin and Chapo Isidro to arrange the shipment of 2,800 kilograms of marijuana via Nogales to the United States. *Id*. at 9–10. Prior to the shipment, Agustin escorted CI-3 to Chapo Isidro's ranch, "where there were approximately 300 gunmen present, armed with automatic rifles, grenades and rocket propelled grenades." *Id*. at 10. After Chapo Isidro approved the transaction, the marijuana shipment was sent to Nogales for transport by another confidential informant ("CI-4"), who was "unable to cross the drugs into the United States." *Id*. About thirty days later, the Mexican Army seized the marijuana in Nogales. *Id*.

As a result of this seizure, Chapo Isidro, Agustin, and Panfilo held CI-3, CI-4, and a third informant, ("CI-5"), responsible for paying off the debt for the seized marijuana, and Agustin and Panfilo allegedly tried to take control of CI-3's properties as part of the debt repayment. *Id.* In October 2011, Agustin allegedly sent armed gunmen to CI-3's business in Bamoa, where CI-3 was kidnapped for a total of nineteen days until CI-5 paid USD $200,000 in cash and properties, with an understanding to pay the rest of the debt later. *Id.* During his kidnapping ordeal, CI-3 was held at a camp where he "saw the bodies of young men who and been tortured and murdered lying about the camp," and other captives, who "had their legs broken so that they could not escape." *Id.*

After CI-3's release, a lawyer, Pedro Ozuna, advised CI-3 and CI-5 to release their properties to Ozuna, or else pay $1,000,000 to Chapo Isidro and Agustin by December 31, 2011. *Id.* at 11. Fearing for their lives, CI-3 and CI-5 fled to the United States, but continued to negotiate the debt with Agustin. *Id.* CI-5 assured Agustin in a consensually recorded call on February 13, 2012, that they were not responsible for the debt and were scared due to the kidnapping, and requested addition time to pay the June 2011 marijuana debt. *Id.* These discussions continued via Blackberry Messenger (BBM) until, on June 22, 2012, a family member of CI-3 and CI-5 was kidnapped by members of the MF-DTO to force payment of the debt. *Id.* After Agustin was arrested in Mexico on July 24, 2012, on the United States' provisional arrest warrant pending an extradition request, CI-5 began receiving BBM messages from Panfilo regarding payment of the debt. *Id.* The government then sought, and the United States District Court for the Western District of Texas authorized, Title III interceptions of electronic communications over 59 devices used by DTO co-conspirators, from February 2013 to December 2014, including Panfilo, which wiretap ultimately led to the interception of over

12,500 pertinent intercepts between Panfilo and "other DTO co-conspirators." Gov't's Opp'n Agustin's MIL Preclude Post-Arrest Intercepts Mot. at 4.[3] In these intercepted communications, Panfilo allegedly discussed "the growing, harvesting, and packaging of marijuana, the production and sale of heroin, the sale of methamphetamine, cocaine, and guns, and violent acts, with other members known and unknown of the [MF-]DTO." Gov't's Consolidation Mot. at 12.

Agustin was indicted on May 2, 2012, in this Court, of conspiring, for a period of about twelve years, from January 2000 through the date of indictment on May 2, 2012, "both dates being approximate and inclusive," to distribute and import into the United States of 5 kilograms or more of cocaine, 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, 1 kilogram or more of heroin, and 1000 kilograms or more of marijuana; and, for a period of about two years, from July 2010 to May 2012, pursuant to 18 U.S.C § 3238 and within the venue of the District Court for the District of Columbia, of using, carrying or brandishing a firearm during or in relation to drug crime charged in the prior count. *See* Agustin Indictment, *United States v. Agustin Flores Apodaca*, Crim. No. 12-116 at 1–3 (D.D.C. May 2, 2012), ECF No. 1.[4] Following his arrest by the Mexican Federal Police in Mexico on July 24, 2012, Agustin claims he was subjected to brutal torture that resulted in permanent loss of his vision in one eye, as documented in a medical report by a Mexican forensic specialist, Dr. Jorge Enrique Leon Robles. *See* Agustin's Suppress Stms. Mot. at 3. He was also allegedly subjected to multiple death and other forms of threats to his family. *Id.* at 7.

---

[3] The first device subject to the Title III interception was used by Panfilo, who "thereafter switched to three additional target devices." *Id.*

[4] Both Fausto Isidro Meza Flores and Salome Flores Apodaca were indicted with Agustin in a two-count indictment, *see generally id.*, but were not extradited to the United States.

Before he made an initial appearance in this Court on October 21, 2015, Agustin was interviewed twice by the FBI: the first time, on September 26, 2012, during his detention in a Mexican prison; and, the second time, on October 20, 2015, after he was ordered extradited and during his travel to the United States. *See* Agustin's Suppress Stms. Mot. at 1. He seeks to suppress both of those statements. *See generally id.* Agustin has been in continuous custody in Mexico and the United States since his arrest in July, 2012.

Two years after Agustin's indictment, his brother Panfilo was indicted in March 2014, for substantially the same charges. Specifically, Panfilo is charged, with conspiring, for a period of about fourteen years, from January 2000 through the date of indictment on March 13, 2014, "both dates being approximate and inclusive," to distribute and import into the United States 5 kilograms or more of cocaine, 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, 1 kilogram or more of heroin, and 1,000 kilograms or more of marijuana; and for a period of about nine years, from January 2005 to the date of indictment on March 13, 2014, pursuant to 18 U.S.C § 3238 and within the venue of the District Court for the District of Columbia, of using, carrying or brandishing a firearm during or in relation to drug crime charged in the prior count. *See* Indictment ("Panfilo Indictment"), ECF No. 1. Panfilo was arrested in Guasave, Mexico, on April 8, 2015, and has been in continuous custody since then in Mexico and, after his extradition on October 11, 2016, in the United States.

The Court now turns to several of the pending pretrial motions.

## II.    DEFENDANTS' CHALLENGES TO THE INTRODUCTION OF INTERCEPTED COMMUNICATIONS AND ALLEGED CO-CONSPIRATOR STATEMENTS

The defendants bring a multi-faceted challenge to the government's introduction of Title III intercepts and other co-conspirator statements at trial. First, Agustin has moved to preclude introduction of the intercepts obtained after he was arrested, arguing that he exited the conspiracy at the time of his arrest, and, therefore, co-conspirators' statements that post-date his arrest cannot be introduced against him. *See generally* Agustin's MIL Preclude Post-Arrest Intercepts, ECF No. 51. Second, the defendants have jointly moved for a pre-trial hearing to address the duration of each defendant's participation in the alleged conspiracy and to determine the admissibility of any statements of alleged co-conspirators pursuant to Federal Rule of Evidence 801(d)(2)(E). *See generally* Defs.' Jt. Hr'g Mot., ECF No. 52. Third, Agustin argues that the admission of any Title III wiretap evidence against him would violate the Rule of Specialty and therefore argues that all intercepted communications must be suppressed as to him. *See generally* Agustin's Specialty Mot., ECF No. 54. Each of these motions is addressed in turn.[5]

### A.  Agustin's Motion to Preclude Introduction of Post-Arrest Title III Intercepts

Agustin has moved to preclude admission against him of any evidence obtained from the Title III intercepts against him on grounds that he "was arrested in Mexico on July 24, 2012," at which time he had presumptively "withdrawn from the conspiracy," and "the wiretap did not commence until February 2013—after the time frame of the charges contained in the Indictment

---

[5] The Court reserves ruling, pending further briefing, on the defendants' other attacks on the government's wiretap evidence, namely, Agustin's and Panfilo's separate motions to compel discovery concerning the wiretaps, *see* Agustin's Discovery Mot., ECF No. 40; Panfilo's Discovery Mot., ECF No. 41; and Panfilo's Am. Discovery Mot., ECF No. 45, and the defendants' joint motion to suppress all wiretap evidence, *see* Defs.' Jt. Mot. Suppress Intercepts, ECF No. 33.

against him," in reliance on *United States v. Escobar*, 842 F. Supp. 1519, 1528 (E.D.N.Y. 1994), a non-binding, out-of-Circuit district court decision. Agustin's MIL Preclude Post-Arrest Intercepts at 1, ECF No. 51. Agustin reasons that if his withdrawal from the conspiracy is marked by his arrest, "the contents of the wiretap intercepts are inadmissible hearsay and cannot be introduced against him," under Federal Rule of Evidence 801(d)(2)(E). *Id.* at 2–3 (citing *Bourjaily*, 483 U.S. at 175–76). This argument to preclude admission of the Title III intercepts is based on the faulty premise that Agustin's arrest is sufficient evidence of his withdrawal from the charged conspiracy to bar admission of alleged co-conspirator statements made after that arrest. This is not the law in this Circuit, and Agustin has otherwise failed to sustain sufficiently his burden of showing his withdrawal from the charged conspiracy. Consequently, as explained further below, Agustin's motion to suppress the wiretap evidence on this ground is denied.

### 1. Relevant Legal Standard

The law is well-established that "[c]onspiracy is a crime that presumes continuity until accomplishment or termination; once a defendant becomes a member of a conspiracy, he remains a member until he affirmatively withdraws or the conspiracy ends." *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011) (citing *Hyde v. United States*, 225 U.S. 347, 368–70 (1912)). As a result, "once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws." *Id.* Contrary to Agustin's assertion of the applicable law, the mere fact that a defendant is arrested does not, without more, demonstrate withdrawal from a conspiracy. Instead, the D.C. Circuit has made clear that "[t]o establish withdrawal, a defendant may show that it has taken '[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" *Osborn v. Visa*

*Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978)); *see also Hyde*, 225 U.S. at 369–70 (holding that a defendant remains a member of the conspiracy "until he does some act to disavow or defeat the purpose . . ."); *United States v. Garrett*, 720 F.2d 705, 714 (D.C. Cir. 1983) ("[T]o establish an effective withdrawal, the defendant must show that he took affirmative action to defeat or disavow the purpose of the conspiracy."). As the D.C. Circuit recently noted, "withdrawal from the conspiracy is difficult, requiring an affirmative step." *Bahlul v. United States*, 840 F.3d 757, 800 (D.C. Cir. 2016). Thus, withdrawal requires either coming clean to authorities or communicating abandonment to co-conspirators. *See United States v. Walls*, 70 F.3d 1323, 1327 (D.C. Cir. 1995).

   2.   *Analysis*

Agustin acknowledges, as he must, that he bears the burden of establishing that he withdrew from the conspiracy upon his arrest, *see* Agustin's MIL Preclude Post-Arrest Intercepts at 3, a burden that must be proven by a preponderance of the evidence, *see Smith v. United States*, 568 U.S. 106, 109 (2013) (holding "that the defendant bears the burden of proof and that such a disposition does not violate the Due Process Clause"); *Moore*, 651 F.3d at 90 (holding that "the district court correctly instructed the jury that the defendant bore the burden of persuasion to show that he withdrew from the conspiracy" and noting that "[w]e previously have said unequivocally, albeit in the context of sentencing, that the defendant, not the government, 'has the burden of proving that he affirmatively withdrew from the conspiracy if he wishes to benefit from his claimed lack of involvement'" (quoting *United States v. Thomas*, 114 F.3d 228, 268 (D.C. Cir. 1997))); *United States v. Dale*, 991 F.2d 819, 854 (D.C. Cir. 1993) ("Defendants have the burden of proving they affirmatively withdrew from the conspiracy[.]"); *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) (same). As support for his argument that he

11

withdrew from the conspiracy, Agustin points to the fact that he was arrested and thereafter "was not intercepted during the twenty-three month wiretap investigation," and no allegation has been proffered that he took "any other action in furtherance of the conspiracy . . . after his incarceration." Agustin's MIL Preclude Post-Arrest Intercepts 1. Moreover, Agustin notes that "indeed, the prosecution has stated that it did not intend to use the intercepted communications against him if he was the sole defendant in the case." *Id*. at 4.

This evidence falls far short of showing affirmative withdrawal from the conspiracy, particularly in light of other evidence proffered by the government. At the outset, the mere fact that Agustin was arrested does not amount to withdrawal. As the Supreme Court has observed, "[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy." *Smith*, 568 U.S. at 112–13; *see also United States v. Wilson*, 605 F.3d 985, 1037 (D.C. Cir. 2010) (noting defense concession that "his imprisonment" did not, standing alone, constitute a withdrawal from the conspiracy); *United States v. Wilkerson*, 656 F. Supp. 2d 22, 44 (D.D.C. 2009) (noting "correct" reading of the law "that incarceration by itself is not an affirmative act of withdrawal and creates no presumption of withdrawal") (citing *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997) ("Although a conspiracy's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy, an arrest may under certain circumstances amount to a withdrawal." (internal quotation omitted))); *United States v. Harris*, 542 F.2d 1283, 1301 (7th Cir. 1976) ("The arrest or incarceration of a conspirator may constitute a withdrawal for a conspirator, but it does not as a matter of law.").

Indeed, when given an opportunity two months after his arrest to "come clean to authorities," during a visit by FBI and DEA agents at the Altiplana Federal Rehabilitation Center in Toluca, Mexico, on September 26, 2012, Agustin instead made, in the government's view, "a

self-serving exculpatory statement" indicating "that he was only a business man, involved in agriculture and denied any involvement in drug trafficking." Gov't's Opp'n to Agustin's MIL Preclude Post-Arrest Intercepts at 7. Agustin did not clearly communicate any withdrawal from the conspiracy or take any affirmative steps to do so. Certainly, by virtue of his arrest, Agustin's role in the conspiracy necessarily changed but that simply does not amount to withdrawal. *See Garrett*, 720 F.2d at 714 (rejecting withdrawal defense and observing that the defendant "confuses abandonment of criminal purpose with the mere fact that his role in the criminal venture, the success of which he always intended, had come to an end").

In short, Agustin has not met his burden of showing that he withdrew from the conspiracy either before or during the period of the Title III interceptions and, consequently, those communications in furtherance of the conspiracy would be appropriately admissible against him. *See United States v. Thomas*, 114 F.3d 228, 267–68 (D.C. Cir. 1997) (finding that where the defendant failed to meet burden of showing affirmative withdrawal from conspiracy, "drugs handled by the conspiracy" after the defendant's "claimed lack of involvement" were properly attributed to him); *United States v. Childress*, 58 F.3d 693, 733 (D.C. Cir. 1995) ("[B]ecause he does not claim he affirmatively withdrew from the conspiracy, Childress is criminally responsible . . . for *all* of his compatriots' foreseeable conduct in furtherance of those goals."); *United States v. Alcorta*, 853 F.3d 1123, 1139–41 (10th Cir. 2017) (rejecting the defendant's argument that intercepted calls were improperly admitted as not in furtherance of the conspiracy when communications occurred after the arrest of two co-conspirators since the argument that "the conspiracy terminated upon" the arrests was "based on an erroneous factual premise," given that the defendant's drug operations did not end with the arrests).

For these reasons, Agustin's motion to exclude Title III intercepts obtained after his arrest on the ground that his arrest effectively marked his withdrawal from the conspiracy is denied.

### B. Defendants' Joint Motion for Pretrial Hearing of Admissibility of Alleged Co-Conspirator Statements

Agustin and Panfilo have jointly moved for "a hearing in order to make a pre-trial determination as to the duration and participation of each defendant in the alleged conspiracy and to determine the admissibility of any statements of alleged co-conspirators pursuant to Fed. R. Evid. 801(d)(2)(E)." Defs.' Jt. Mot. Pretrial Hr'g of Admissibility of Alleged Co-Conspirator Statements ("Defs.' Jt. Mot. Hr'g") at 1, ECF No. 52. In support, the defendants cite three "substantial reasons to conduct such a pre-trial hearing," *id.* at 5: first, although they are charged with a conspiracy that began in 2000, "the only evidence that has been provided to the defense consists of events that took place ten years later," *id.*; second, the government's evidence regarding the three drug seizures, which occurred in September 2010 and June 2011, includes alleged conversations of Agustin with informants, but "no mention" of Panfilo," *id.* at 5–6; and, finally, despite reference to the BL-DTO in the extradition papers, no "specific discovery concerning" this DTO, which is a "separate criminal organization," has been provided and should not be admissible, *id.* at 6.[6]

The government objects to holding a pre-trial hearing, proffering that, through witness testimony at trial, the "Government will show that the Defendants, their nephew and brother along with other co-conspirators were working together to traffic narcotics from Mexico into the

---

[6] Agustin also cites his arrest in July 2012 as marking his withdrawal from the conspiracy, thereby precluding the admissibility as co-conspirator statements, under Federal Rule of Evidence 801(d)(2)(E), of any statement made thereafter, Defs.' Jt. Mot. Hr'g at 6, but this basis for barring admission of post-arrest co-conspirator statements has been rejected, *see supra* at Part II.A.

United States." Gov't's Opp'n to Defs.' Jt. Mot. Hr'g at 5, ECF No. 60. For the reasons set out below the defendants' joint motion for a pretrial hearing on this issue is denied.

### 1. Relevant Legal Standard

Federal Rule of Evidence 801(d)(2)(E) provides that an out-of-court statement is not hearsay if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy," with further instruction that "the statement must be considered, but does not by itself establish . . . the existence of the conspiracy or participation in it under (E)." FED. R. EVID. 801(d)(2). Upon objection to admission of an alleged co-conspirator's out-of-court statement, "the district court must find by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant were members of that conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)). As reflected in the Rule itself, an out-of-court statement cannot alone support the necessary finding that the defendant and declarant were together involved in a conspiracy. FED. R. EVID. 801(d)(2); *see also Gewin*, 471 F.3d at 201 (noting "that the finding [of conspiracy's existence and defendant and declarant's membership in conspiracy] must rest on some independent evidence of the conspiracy") (citing *United States v. Gatling*, 96 F.3d 1511, 1520–21 (D.C. Cir. 1996)). Thus, the ultimate admissibility determination must rest both on finding that the challenged co-conspirator statement is in furtherance of the conspiracy and, at least partially, on some independent evidence of the conspiracy.

### 2. Analysis

The parties agree on the law applicable to determining whether alleged co-conspirator statements are admissible under Rule 801(d)(2)(E) but dispute the preferable timing for when

this determination should be made. In this regard, Federal Rule of Evidence 104(c) expressly addresses the circumstance in which the relevance, and therefore the admissibility, of evidence "depends on whether a fact exists," and authorizes a court to "admit the proposed evidence on the condition that the proof be introduced later." FED. R. EVID. 104(c). Notwithstanding this timing rule allowing deferral of the determination of the prerequisites for admission of co-conspirator statements with conditional admission of the challenged statements, the defendants, relying on *United States v. Jackson*, 627 F.2d 1198 (D.C. Cir. 1980), seek a pretrial hearing at which the government will present evidence to support its charged conspiracy and the defendants' participation in it, along with the co-conspirators whose out-of-court statements the government intends to introduce. Defs.' Jt. Mot. Hr'g at 5–6. Indeed, the D.C. Circuit has suggested that the "preferred practice is for the trial court to make these determinations before the hearsay evidence is admitted." *United States v. Slade*, 627 F.2d 293, 307 (D.C. Cir. 1980); *Jackson*, 627 F.2d at 1218 ("[T]he better practice is for the court to determine before the hearsay evidence is admitted that the evidence independent of the hearsay testimony proves the existence of the conspiracy sufficiently to justify admission of the hearsay declarations.").

Yet, in these same cases, the Circuit has acknowledged that, due to "practical impediments," "it is just impractical in many cases for a court to comply strictly with the preferred order of a proof by taking the testimony of such witnesses piecemeal, waiting until a conspiracy is fully proved by independent evidence, and then recalling from their normal pursuits, those who testify to hearsay declarations of co-conspirators." *Jackson*, 627 F.2d at 1218. Consequently, "the court is vested with considerable discretion to admit particular items of evidence 'subject to connection.'" *Id*. (internal citation omitted); *see also Slade*, 627 F.2d at 307 (acknowledging that the trial court "retains discretion . . . to admit particular co-conspirator

16

statements conditioned on a later showing of substantial independent evidence of the three prerequisites for their admission").

In particular, "a decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994). Doing so conserves judicial resources by avoiding "what would otherwise become a separate trial on the issue of admissibility." *United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980), *abrogated on other grounds by In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996). If, however, "at the close of the government's case, or at any other critical point," the government has failed to meet its burden, the court "must upon motion, and may *sua spont*e, strike the testimony that has not been sufficiently connected and direct the jury to disregard it." *Jackson*, 627 F.2d at 1218 (citing authorities). Where such an instruction "cannot cure the prejudice threatened by the inadmissible hearsay[,] a mistrial is required." *Id*.

As recognized by the D.C. Circuit, the "practical impediments" to holding a pretrial hearing on the preliminary questions about the existence of a conspiracy and the defendant and declarant's participation in it, has led to the general practice in this jurisdiction to defer these determinations until the trial. *See, e.g.*, *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 52–53 (D.D.C. 2016) (deferring to trial "final ruling on the admissibility of" alleged co-conspirator emails); *United States v. Knowles*, 2015 U.S. Dist. LEXIS 178210, at *7–9 (D.D.C. Dec. 30, 2015) ("Standard practice in this district is to allow the government to admit coconspirator statements conditionally, subject to connection by the government at trial.") (quoting *United States v. Larrahondo*, 885 F. Supp. 2d 209, 220 (D.D.C. 2012))); *United States v. Savoy*, 889 F. Supp. 2d 78, 111–12 (D.D.C. 2012) (denying the defendant's motion for pretrial hearing and

deferring determination of conspiracy to trial); *United States v. Loza*, 763 F. Supp. 2d 108, 111–12 (D.D.C. 2011) ("In this district it is common practice for a court to avoid a 'disfavored 'mini-trial' of the evidence' by deferring its determination regarding the admissibility of alleged co-conspirator statements until after the close of the government's case." (citing *United States v. Cooper*, 91 F. Supp. 2d 60, 78 (D.D.C. 2000) (declining to hold a pretrial evidentiary hearing on this issue), and *United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 37 (D.D.C. 2000) (rejecting a request for a pretrial hearing on admissibility of co-conspirator statements because "having a pretrial hearing essentially would create a time-consuming mini-trial before the trial")); *United States v. Eiland*, 2006 U.S. Dist. LEXIS 11726, at *18–19 (D.D.C. Mar. 1, 2006) (denying a defense motion for pretrial determination of the admissibility of alleged co-conspirator statements).  The reasons proffered by the government for following this general practice in this case are persuasive.

In particular, despite the pre-trial discovery evidentiary gaps identified by the defendants, the government indicates that the charged "conspiracy will be evidenced at trial through the testimony of cooperating witnesses (the Defendants' co-conspirators), co-conspirator statements and through evidence of drug seizures in Mexico and the United States." Gov't's Opp'n to Defs.' Jt. Mot. Hr'g at 4.  Plainly, some of the same witnesses will be testifying about the existence and activities of the charged conspiracy and the co-conspirator statements.  Requiring these witnesses to testify twice, first at a pretrial hearing and second at the trial itself, would result in duplicative testimony, "allow defense counsel two bites at the apple to cross-examine the cooperating witnesses in this case," *id*. at 10; and raise "a significant concern about the safety of these cooperating witnesses and their families," *id*. at 11, in light of proffered government evidence about the use of weapons, kidnapping, and other violence associated with the charged

conspiracy. *See United States v. White*, 116 F.3d 903, 915, 916 (D.C. Cir. 1997) (noting that "courts routinely admit hearsay statements of co-conspirators subject to connection through proof of a conspiracy" and affirming trial court's sequencing of proof since defendants' proposed preliminary hearing for proof of conspiracy "would have been wasteful of judicial time, as the hearing and trial testimony on the murder would have been largely duplicative," and "seriously increased the risks to the witnesses"); *United States v. Edelin*, 128 F. Supp. 2d 23, 45–46 (D.D.C. 2001) (denying the defendant's request for an advance determination of conspiracy since such a pretrial hearing "would be lengthy, further delaying the trial in this case and placing an unreasonable burden on the government," and "would jeopardize the safety of cooperating witnesses and other persons"). These considerations militate strongly in favor of permitting the government to introduce the co-conspirator statements, subject to connection, at trial. [7]

Accordingly, the defendants' joint motion for a pretrial hearing on the admissibility of co-conspirator statements is denied.

### C. Agustin's Motion to Enforce the Rule of Specialty

In yet another effort to bar admission against him of "any and all information obtained as the result of the Government's Title III wiretap in this case," Agustin's Mot. Enforce the Rule of Specialty ("Agustin's Specialty Mot.") at 1, ECF No. 54, Agustin contends that the admission of such interceptions "would also constitute an impermissible constructive amendment of the Indictment that formed the basis of the extradition request," *id.*, and thereby violate the Rule of Specialty. As grounds for this contention, he asserts that "the basis for the extradition included

---

[7]       The government has also moved to introduce "co-conspirator statements in the form of: [(1)] oral statements; [(2)] photographs of drug ledgers; and [(3)] intercepted electronic communications." Gov't's Mot. at 1. Generally, co-conspirator statements will be conditionally admitted at trial, subject to proof of the existence of a conspiracy and the defendants' involvement therein by a preponderance of the evidence, and to the extent such statements are otherwise admissible, including under Federal Rules of Evidence 401, 403 and/or 404(b).

only events that took place before May 2, 2012—the date the Indictment was returned," and the government indicated no intent "to use post-Indictment evidence against Agustin [], or that it reserved the right to do so." *Id.*

Indisputably, the Title III intercepts Agustin seeks to exclude were obtained after the indictment against this defendant was returned in May 2012 and his arrest in July 2012. *See* Gov't's Opp'n to Agustin's Specialty Mot. at 8, ECF No. 64 (stating the government's intention "to introduce other crimes evidence and co-conspirator statement evidence," including "statements of Co-defendant Panfilo intercepted pursuant to the Government's Title III electronic interception investigation" that "occurred after May 2, 2012, the date the Defendant was indicted"). Nevertheless, Agustin's contention falls far short of violating the Rule of Specialty, which poses no obstacle to admission of post-indictment evidence against him.

The Rule of Specialty is a doctrine that "an internationally extradited defendant may be tried only 'for the offenses specified in the warrant of extradition . . . .'" *Day v. Trump*, 860 F.3d 686, 689 (D.C. Cir. 2017) (quoting 18 U.S.C. § 3192, and citing *United States v. Rauscher*, 119 U.S. 407, 423–24 (1886) (an extraditee may not be "delivered up" to be "tried for any other offense than that [with which he was] charged in the extradition proceedings")); *United States v. Kember*, 685 F.2d 451, 458 (D.C. Cir. 1982) (explaining that the Rule of Specialty "requires that a requisitioning state may not, without the permission of the asylum state, try or punish a fugitive for any crimes committed before the extradition except the crimes for which he was extradited" (internal citations omitted)). This doctrine is expressly incorporated into the Mexico–United States Extradition Treaty, which provides that "[a] person extradited under the present Treaty shall not be detained, tried, or punished in the territory of the requesting Party for an *offense* other than that for which the extradition has been granted . . . ." Extradition Treaty Between the

20

United States of America and the United Mexican States, art. 17, Feb. 6, 1980, 31 U.S.T. 5059 (emphasis added).

At the outset, as the government points out, Gov't's Opp'n to Agustin's Specialty Mot., at 5 n.2, Agustin may not have standing to raise a challenge under the Rule of Specialty since the D.C. Circuit has declined to resolve conflicting authority and opine "as to whether a criminal defendant—as opposed to the extraditing state—has standing to assert the doctrine of specialty." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013); *see also United States v. Todd*, 287 F.3d 1160, 1165 (D.C. Cir. 2002) (recognizing "that we are leaving certain legal questions raised by the Government unresolved," including "whether [defendant] lacks standing to bring a claim [of violation of rule of specialty] based on alleged threats to prosecute him for visa and tax fraud," when he was not extradited to face such charges); *United States v. Sensi*, 879 F.2d 888, 892 n.1 (D.C. Cir. 1989) (declining to resolve this question); *Casey v. Dep't of State*, 980 F.2d 1472, 1476 n.4 (D.C. Cir. 1992) ("[I]t remains an open question in this circuit whether Casey has 'standing' to raise his claims after extradition.").

At the same time, assuming that the merits of this argument may properly be reached, the D.C. Circuit has stressed that "the doctrine of specialty governs prosecutions, not evidence." *Lopesierra-Gutierrez*, 708 F.3d at 206. Consequently, evidence admitted to bolster proof of the crime for which the defendant was extradited does not amount to a violation of the Rule of Specialty. *Id*. For example, in *Lopesierra-Gutierrez,* the D.C. Circuit found that "the doctrine of specialty has no bearing" on the admission at trial of the extradited defendant's involvement in a conspiracy to ship cocaine in 1996, which occurred prior to the start of the charged conspiracy, and was admitted "for the limited purpose of showing knowledge or intent." 708 F.3d at 205–06; *see also United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 186 (D.D.C. 2015)

(denying the defendants' objection to admission of other crimes evidence as a violation of the Rule of Specialty since the evidence did not alter the charges for which defendants were being prosecuted).

The evidence that the government intends to introduce against Agustin simply does not alter the specific charges for which he was indicted and extradited.[8] Thus, the Rule of Specialty has no bearing on admission of this post-indictment evidence and provides no basis for exclusion. Accordingly, Agustin's invocation of the Rule of Specialty as grounds to exclude the Title III wiretap evidence against him is denied.

## III.    AGUSTIN'S MOTION TO SUPPRESS STATEMENTS

Agustin has also filed a motion seeking suppression of "any and all statements made to law enforcement agents, whether Mexican or United States law enforcement, at any time subsequent to his arrest in Mexico in July, 2012, to the present." Agustin's Suppress Stms. Mot. at 1. Agustin focuses in particular on statements he made to U.S. law enforcement agents on two different dates: September 26, 2012, when agents questioned him while he was imprisoned in Mexico, and October 20, 2015, when he was being transported by law enforcement agents from

---

[8]    In a shifting argument, Agustin also posits that, "[b]eyond the rule of specialty," Agustin's Specialty Mot. at 3, "introduction of thousands of intercepted communications obtained through the Title III wiretap—many of which allegedly concern other criminal acts—would constructively amend the Indictment in this case," *id.* at 4. He is incorrect. A constructive amendment that violates a defendant's right to be charged by a grand jury occurs "only if the deviation in proof or instructions from the specifics of the indictment affects an essential element of the offense charged." *United States v. Sayan*, 968 F.2d 55, 59 (D.C. Cir. 1992) (quoting *United States v. Lemire*, 720 F.2d 1327, 1345 (D.C. Cir. 1983); *see also United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005); *United States v. Mangieri*, 694 F.2d 1270, 1277 (D.C. Cir. 1982). Evidence that merely expands the time frame beyond the end date specified in the charged conspiracy does not alter the essential elements of that criminal offense. *See United States v. Emor*, 573 F.3d 778, 786–87 (D.C. Cir. 2009) (rejecting a challenge of constructive amendment to an indictment due to "variance between the timeline set forth in his indictment and the years for which the government presented evidence at trial," noting that "[a]ll critical aspects of the conspiracy remained unchanged throughout its existence, and the precise timing of the criminal scheme was not a material element either in the indictment or during trial"). Consequently, to the extent Agustin contends that evidence from the Title III intercepts expands the time frame of the charged conspiracy beyond the charged end date of May 2012, this does not amount to a constructive amendment and does not provide a basis for exclusion of the challenged evidence.

Mexico to the United States. *See id.* Agustin argues that his statements on these two occasions, and all evidence derived therefrom, must be suppressed because "(1) admission would violate the Defendant's Sixth amendment rights; (2) the statements are the subject of involuntary acts predicated upon, amongst other factors, the substantial fear of additional torture; (3) the statements were purposely obtained in violation of the Fifth Amendment; and, ([4]), the statements were elicited via a deliberate two-step interrogation procedure of the sort forbidden by *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985)." *Id.* at 10. The government maintains that Agustin's statements are admissible because he "made a knowing, intelligent, and voluntary waiver of his Fifth and Sixth Amendment rights, and made un-coerced statements to law enforcement officers." Gov't Opp'n Agustin's Suppress Stms. Mot. at 1. At hearings on August 2 and August 7, 2017, the Court heard testimony from two government witnesses, Drug Enforcement Administration ("DEA") Special Agent Luis de La Cruz and FBI Special Agent Dean Giboney, and two defense witnesses, Dr. Miguel Angel Carvajal Quinonez and Dr. Jorge Enrique Leon Robles. In light of this testimony, and the arguments presented by the parties in their written submissions and during the hearing, the motion to suppress is denied.

### 1. Relevant Legal Standard

As noted, Agustin argues that the September 2012 statement was obtained in violation of his Fifth Amendment rights, and that the October 2015 statement was obtained in violation of his Fifth and Sixth Amendment rights. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Under the Sixth Amendment, a defendant is guaranteed the right to have counsel present "at all critical stages of the criminal proceedings," including "before trial." *Missouri v. Frye*, 566 U.S. 133,

140 (2012) (internal quotation marks omitted); *accord Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (stating that the Sixth Amendment guarantees defendants "the effective assistance of competent counsel" during plea negotiations (internal quotation marks omitted)). "Critical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Frye*, 566 U.S. at 140.[9]

The Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). *Miranda* requires law enforcement to warn a person subject to custodial interrogation, before any interrogation has begun, "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "Unless a suspect 'voluntarily, knowingly and intelligently' waives these rights, any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (internal citation omitted).

Where, as here, the government acknowledges that the defendant was in custody when questioned by authorities, *see* Gov't's Opp'n Agustin's Suppress Stms. Mot. at 3 (noting that Agustin was "releas[ed] to the custody of the FBI"); *see also id.* at 6–7, 9–15, the government bears the burden of proving, by a preponderance of the evidence, that the defendant validly waived his *Miranda* rights to overcome a motion to suppress any resulting statements,

---

[9]    The government does not dispute that the defendant's Sixth Amendment rights had attached on both occasions when he was questioned by law enforcement agents in connection with this case. *See* Gov't's Opp'n Def.'s Mot. Suppress Statements at 9 (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).

*see Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  As noted, in order to be valid, such a waiver must be both knowing and voluntary.  *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988).  Thus, "'[f]irst, the relinquishment of the rights must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception[; and, s]econd, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Id.* (internal alterations omitted) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  The D.C. Circuit has instructed that, "courts use an 'objective standard' for evaluating a defendant's waiver, and this takes into account 'the education, experience, and conduct of the accused.'"  *Id.* at 965 (quoting *Pettyjohn v. United States*, 419 F.2d 651, 654 n.7 (D.C. Cir. 1969)).

   *2.  Analysis*

   Agustin contests the admissibility of the statements he made to U.S. law enforcement officers on September 26, 2012, and October 20, 2015, insisting that those statements were not voluntarily and knowingly given but instead were the product of lingering fear of authority that Agustin developed after having been tortured by Mexican authorities.  In documenting his torture, the defendant relies on "a medical report by one of the foremost forensic specialists in Mexico, Dr. Jorge Enrique Leon Robles," which report was "introduced into the criminal case dossier in the Mexican tribunal as evidence of the extreme torture and physical injury . . . the Defendant suffered while in custody."  Agustin's Suppress Stms. Mot. at 3; *see also generally* Agustin's Reply Supp. Suppress Stms. Mot., Ex. A, Leon Robles Torture Report, ECF No. 71-1.[10]  The report explains that the defendant was brutally beaten, resulting in "a deteriorating

---

[10]     A certified translation of Dr. Leon Robles's report was introduced as Agustin's Exhibit C during the August 7, 2017 hearing.

muscular-skeletal disorder," "chronic head and neck pain," and "permanent[] damage[] [to] his vision." Agustin's Suppress Stms. Mot. at 4–5. The report also indicates that, upon his arrest, the defendant was "forced to sign documents which incriminate him while receiving multiple death threats towards his family." *Id.* at 3.

The threshold question in this analysis is whether Agustin was in fact tortured by Mexican authorities, which the government continues to dispute. In light of the credible, unrebutted testimony of both Dr. Carvajal Quinonez and Dr. Leon Robles, the Court finds that Agustin was tortured upon his arrest by Mexican officials. In particular, Dr. Carvajal Quinonez testified that Agustin's retina tear was consistent with torture, and Dr. Leon Robles, who specializes in forensic medicine, is an expert on torture, and regularly examines individuals for determinations of torture, testified at length about his previous examination of Agustin and his conclusion that Agustin had been tortured, which conclusion is well documented in Dr. Leon Robles's forensic report.[11] In particular, Dr. Leon Robles testified that he believed that, among other things, Agustin was violently beaten by Mexican authorities upon his arrest, and that these authorities used a form of torture called "the blender" or "the little onion," which causes the subject of the torture to experience intense neck pain. Dr. Leon Robles testified that he believed that Agustin was subjected to these forms of torture based on the "organic manifestations" observed during his examination. Moreover, Dr. Leon Robles conducted a psychological evaluation and concluded that Agustin suffered from Post-Traumatic Stress Disorder ("PTSD"), as evidenced by "intrusive memories of what had happened," "repeated nightmares," loss of trust in himself and others, and a generalized loss of interest. According to Dr. Leon Robles,

---

[11]    Dr. Leon Robles testified that he has issued at least 250 reports similar to the report he prepared in this case since the publication of the Istanbul Protocol, which he described as a manual for the investigation and documentation of torture by the United Nations Office for the Special Commission of Human Rights.

Agustin's behavior while he discussed his torture was likewise consistent with PTSD, including crying, shaking hands, an active carotid gland, increased blood circulation and heart rate, and excessive sweating.  Furthermore, Dr. Leon Robles performed a cortisol test on Agustin, which came back at less than median, indicating the presence of PTSD.  In sum, Dr. Leon Robles testified that he was "certain" that Agustin was tortured by Mexican authorities, and that he was suffering from PTSD seven months after that torture when Dr. Leon Robles conducted his examination.  On this undisputed evidence, the Court finds that Agustin was tortured by Mexican authorities upon his arrest.  Accordingly, the dispositive question is whether that torture renders Agustin's statements involuntarily.   Each of Agustin's contested statements to U.S. law enforcement is addressed in turn.

### a.  The September 2012 Statement

The government put on testimony by DEA Special Agent Luis de La Cruz, who questioned Agustin in September 2012 in a small cell at the Mexican prison along with FBI Special Agent Britton Boyd.  Agent de La Cruz testified that he and Agent Boyd were accompanied by a Mexican attorney, and were seated at a table across from Agustin and separated from him by a "mesh" wall.  A Mexican prison guard stood outside the cell.  As soon as Agustin entered the room, the agents introduced themselves and read Agustin an Advice of Rights ("AOR") form in Spanish, as he read along.  Agustin did not ask any questions about the AOR form, but proceeded to sign it, thereby waiving his rights to remain silent and speak to an attorney before answering law enforcement's questions.  *See* Agustin's Signed AOR Form, Suppression Hearing, Gov't Ex. 10; Translated AOR Form, Suppression Hearing, Gov't Ex. 11.  Agent de La Cruz stated that he did not observe any injuries on Agustin's body, and that he does not recall Agustin being restrained during the questioning.   Further, Agent de La Cruz

27

stated that Agustin spoke in a calm voice, that he sensed no fear in Agustin's voice, nor did he observe that Agustin was shaking. Agustin did mention that he was "beaten up" on the day of his arrest, but the agents told him that they were not there to discuss what occurred the day of his arrest and that he should speak with his attorneys if he had concerns about his treatment. The interview lasted for between thirty and forty minutes, and Agustin did not at any time indicate that he did not wish to speak with the agents. During the conversation, Agustin did not admit to involvement in drug trafficking and maintained that he was a businessman.

Agustin argues that his September 2012 statement was not voluntary or knowing in light of his "past torture and fear of additional torture when he was interrogated by United States agents in the presence of Mexican officials." Agustin's Suppress Stms. Mot. at 11. The government responds that "the Defendant was apprised of his rights, waived those rights, and gave a voluntary statement." Gov't's Opp'n Agustin's Suppress Stms. Mot. at 10. To be precise, during the September 2012 interview, the law enforcement agents provided Agustin with AOR form, in Spanish, and "[a]fter reading the AOR and having the AOR read to him, the Defendant signed and executed the AOR form and did not request counsel." *Id.* According to the government, although "a Mexican prison official was present in the statement room," Agustin "responded to the agents in a conversational tone" and "did not indicate that he was in any distress or request medical attention," and the agents did not observe any physical trauma on his body. *Id.* Further, "[a]ssuming the alleged torture was conducted," the statements obtained by U.S. law enforcement agents in September 2012 are admissible because they are "'so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated.'" *Id.* at 11–12 (quoting *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007). The government contends that the three-factor test for assessing whether a statement is

sufficiently attenuated from the initial unlawful search or seizure is satisfied here.  *See id.* at 12

(citing *United States v. Brodie*, 742 F.3d 1058, 1063 (D.C. Cir. 2014) (referencing the three

factors to be addressed, including (1) the amount of time between the illegality and the discovery

of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy

of the illegal conduct)).

   The totality of the circumstances surrounding Agustin's September 2012 statement to

U.S. authorities compel the conclusion that it was voluntarily and knowingly given,

notwithstanding Agustin's previous torture by Mexican authorities.  As explained by Agent de

La Cruz, no Mexican law enforcement officer was in the room when Agustin spoke with Agent

de La Cruz and Agent Boyd, and Agustin was separated from the agents by a mesh wall.  He was

given an AOR form, which he read, and he proceeded to speak with the agents in a calm

demeanor.  Notably, far from admitting his guilt, Agustin maintained that he was merely a

businessman and was not involved in drug trafficking, which indicates that he had his wits about

him and did not feel coerced to make inculpatory admissions.[12]  On these facts, Agustin's

September 2012 statement was voluntary and knowing and is admissible at trial.

   *b.  The October 2015 Statement*

   The government elicited testimony concerning the October 2015 statement from Special

Agent Giboney, who is assigned to the FBI's Seattle field office, and who participated in

Agustin's extradition from Mexico to the United States along with Special Agent Boyd.[13]

---

[12]   Agustin did refer to the Impala that the U.S. authorities believed had been used in connection with drug trafficking by the Meza Flores DTO, but Agustin had no reason to know that his statement about the Impala would be inculpatory.

[13]   Agent Giboney's testimony was consistent with the FBI Form 302 detailing the extradition and the conversation that occurred on the FBI jet.  *See* Gov't's Opp'n Agustin's Suppress Stms. Mot., Ex. 4, Oct. 2015 FBI Report at 2, ECF No. 62-4.

Special Agent Giboney testified that he first came into contact with Agustin at the Mexico City airport, at which point both Mexican and U.S. authorities conducted medical examinations of Agustin to ensure his fitness for extradition. After this processing, Agustin was escorted onto an FBI jet by three to five agents. He was placed near the rear of the plane in a chair at a table and was restrained with handcuffs, a bellyband, and leg irons. Agustin's eyesight and hearing were temporarily restricted with goggles and earmuffs during take-off and landing. There were several FBI agents on the flight, along with the pilot and co-pilot; no Mexican authorities were on the plane. During the flight, Agustin was given water and soda and was offered a meal, which he declined. Special Agent Giboney testified that Agustin's demeanor was relatively calm but evinced some nervousness, and that overall he was very cooperative. The Special Agents' first interaction with Agustin occurred shortly after take-off. The conversation was in Spanish, and began with Special Agent Boyd explaining to Agustin that he was being extradited to the United States on drug trafficking and firearm charges. Six minutes into the conversation, Agustin was given the AOR form. He requested his reading glasses to review the AOR form. After reading it, Agustin stated that he understood his rights and that he had no questions about the form but questions about the case against him. Agustin declined to sign the AOR form, stating that he had previously spoken to an attorney who advised him not to sign anything. Nevertheless, Agustin agreed to speak with the agents and asked them how his name had ended up on the "black list," the slang term for an OFAC list of individuals subject to economic sanctions. Agustin also discussed horse racing and horse purchases he had made. The interview lasted approximately one to one-and-a-half hours.

Agustin seeks suppression of his October 2015 statement on three grounds. First, Agustin argues that his post-arrest statements "were not knowing, intelligent, and voluntary"

because he was unfamiliar with the U.S. justice system; he was "terrified because he thought he

may again be tortured;" and the defendant suffered through torture while in custody in Mexico.

Agustin's Suppress Stms. Mot. at 14–16. Second, Agustin contends that he "told the government

agents that he was represented by counsel, that counsel had advised him not to make any

statements not to sign any waivers," and that the agents "persisted in questioning him

notwithstanding his refusal to execute a *Miranda* waiver." *Id.* at 10. Finally, he argues that the

law enforcement agents who transported him from Mexico to the United States "engaged in a

deliberate two-step interrogation: they first questioned [him] prior to affording him *Miranda*

warnings" and "then, and only then, administered the warnings." *Id.* at 13 (citing *Missouri v.

Seibert*, 542 U.S. 600 (2004)).

The government argues that the defendant's statements made during the October 2015

interview are admissible because "the Defendant was apprised of his rights, *orally* waived those

rights, and then gave voluntary statements to law enforcement." Gov't's Opp'n Agustin's

Suppress Stms. Mot. at 15 (emphasis in original) (noting that the defendant was provided an

AOR form to review, though he declined to sign the form, but nevertheless spoke with the law

enforcement agents). The government maintains that Agustin's telling of events is "factually

incorrect" because although he indicated that he had a lawyer, and the lawyer had instructed him

not to sign anything, Agustin nevertheless expressed a desire to speak with the agents. *Id.* at 15–

16 ("[T]he Defendant's statements about his attorney were not an invocation of his right to have

counsel present. The mere mention of an attorney and reference to advise from an attorney is not

an unambiguous invocation of the right to counsel."). As for Agustin's contention that he was

subjected to a "deliberate two-step interrogation," the government asserts that "[the] [a]gents did

not ask any questions of the Defendant until he had orally agreed to waive his rights after he read

the [AOR] form," and that the agents merely "informed Defendant of the nature of the charges and a background of the investigation that had led to his extradition" before providing the AOR. *Id.* at 17.

First, the totality of the circumstances surrounding Agustin's October 2015 statement again demonstrate that the statement was voluntary and knowing. This statement was much farther removed from the torture than Agustin's previous statement, and long after Dr. Leon Robles's examination, but assuming that Agustin continued to experience PTSD in October 2015, Agustin clearly had his wits about him on the flight from Mexico City to the United States, as evidenced by the fact that, to his mind, he again did not make any inculpatory statements.[14] In addition, Agustin was provided an AOR form, which he read after requesting his reading glasses. Although he did not sign the form, he proceeded to speak with the Special Agents and in fact stated a *desire* to speak with them to find out about his alleged placement on the "black list." Moreover, the fact that Agustin declined to sign the AOR form indicates that his will was not overborne by the presence of U.S. law enforcement authorities.

The defense makes much of the similarities between Agustin's questioning on the FBI jet *en route* to the United States and an incident shortly after his arrest in which Mexican authorities placed Agustin in a helicopter, blindfolded him, and threatened to throw him off the helicopter or hurt his family members if he did not incriminate himself. Although the two situations bear limited similarities in terms of being airborne and temporary blindfolding, Agustin was in U.S. custody at the time of the second questioning, with no Mexican authorities on the plane, and Agustin does not suggest that he was in any way threatened by the FBI agents. To the contrary,

---

[14]     The government explains that Agustin did mention the sale of a horse, which may be inculpatory, and he also confirmed that he heard his voice on recorded phone calls, but Agustin had no reason to believe either of these statements would be inculpatory.

he was offered food, water, and soda, and provided an AOR form. Thus, the helicopter incident does not render Agustin's statements during extradition involuntary, and his statement is not inadmissible on that basis.

Agustin's second argument in favor of suppression boils down to the question whether he adequately invoked his right to counsel by stating that he had an attorney and his attorney had advised him not to sign anything. The government argues that "the mere mention of an attorney and reference to advice from an attorney is not an unambiguous invocation of the right to counsel." Gov't Opp'n Agustin's Suppress Stms. Mot. at 16. As noted above, the parties dispute exactly what Agustin said to the FBI agents. Whereas Agustin argues that he "told the government agents that he was represented by counsel, that counsel had advised him not to make any statements nor to sign any waivers," Agustin's Suppress Stms. Mot. at 10, the government contends that Agustin merely "indicated that he *wished* to speak with the agents, but that he could not sign any documents on advice of his attorney," Gov't Opp'n Agustin's Suppress Stms. Mot. at 15–16. The Court finds, based on the unrebutted testimony from Special Agent Giboney, who presented as credible and forthright, that although Agustin stated he had spoken with an attorney who had advised him not to sign anything, Agustin expressed a desire to speak with the Special Agents. Thus, the question is whether this statement and refusal to sign the AOR form constitutes invocation of Agustin's right to counsel.

As the Supreme Court has explained, if a suspect "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel . . . precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 458 (1994) (emphasis in original). In *Davis*, the Supreme Court held that the defendant's statement

33

"[m]aybe I should talk to a lawyer" was insufficient to invoke his right to counsel. *Id.* at 455.

As other courts have explained, mere references to an attorney are insufficient to meet *Davis*'s

exacting standard. *See, e.g.*, *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) ("Sechrest

said that he had spoken with his attorney and had been advised to 'keep his mouth shut.' This

mention of an attorney and reference to advice from an attorney is not an unambiguous request

for counsel."); *United States v. Hitselberger*, 991 F. Supp. 2d 130, 143 (D.D.C. 2014) (rejecting

the defendant's argument that he had invoked his right to counsel where the defendant had

"declar[ed] that he would feel 'more comfortable' with a lawyer" because such a statement "is

not a clear and unequivocal request for a lawyer, and a reasonable officer could be confused as to

whether the Defendant was actually invoking his right to counsel before additional questioning

took place"). Clearly, then, under applicable caselaw, Agustin did not invoke his right to

counsel, since he simply stated that he had spoken to an attorney and was instructed not to sign

an AOR form.

 Agustin's third argument is that the FBI agents, who accompanied him on his journey

from Mexico to the United States, engaged in the "question-first, warn-second" method of

questioning, in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004); *see also United States v.

Hitselberger*, 991 F. Supp. 2d 130, 141 (referring to the "'question-first, warn-second' tactic").

Again, there are factual disputes here as to what occurred during the October 2015 questioning.

Whereas Agustin, in briefing, contends that the agents asked questions first, then provided an

AOR, Def.'s Mot. Suppress Statements at 13, the government maintains that "[a]gents did not

ask any questions of the Defendant until he had orally agreed to waive his rights after he was

read the advice of rights form," Gov't's Opp'n Agustin's Suppress Stms. Mot. at 17 (noting that

the government's version of events is "evidenced by the memorialized report as well as the

content of Defendant's exculpatory statements"). Here, as the government points out, the FBI report detailing Agustin's extradition from Mexico to the United States provides that "[a]t approximately 3:00 p.m., the FBI plane departed the Mexico City airport, and at approximately 3:07 p.m., SA Giboney and SA Boyd sat down with FLORES APODACA to conduct an interview." Gov't's Opp'n Agustin's Suppress Stms. Mot., Ex. 4, Oct. 2015 FBI Report at 2, ECF No. 62-4. After providing Agustin some information about the case against him, including that the case "originated in Washington State from the illegal weapons and narcotics trafficking activities taking place there," at approximately 3:16 p.m., he "was presented with an international advice of rights form in the Spanish language." *Id.* The report indicates that "FLORES APODACA read through the document" and "was asked if he understood his rights and if he had any questions." *Id.* In response, Agustin "indicated that he understood his rights and was willing to talk to investigators, but did not want to sign the advice of rights document because an attorney had told him not to sign anything." *Id.*

In *Seibert*, the Court addressed the validity of "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," and then asking the suspect to repeat the statements after the proper warnings were administered. *Id.* at 604. A plurality of the Court, joined by Justice Kennedy in an opinion concurring in judgment, concluded that "the 'question-first, warn-second' tactic can indeed be coercive, . . . no tactic is per se unconstitutional." *Hitselberger*, 991 F. Supp. 2d at 141. When interrogators engage in this tactic, the question "is thus whether it would be reasonable to find that in the[] circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert*, 542 U.S. at 611–12. Here, the FBI Report makes clear that there was no questioning of Agustin until after he had reviewed the AOR form, and there is no

evidence that Agustin responded to the agents with any incriminating information before he read the AOR form. Thus, the facts of this case are wholly distinguishable from *Seibert* and other cases in which *Miranda* warning administered "midstream," and post-confession, were sufficient. *Id.* at 604; *see also Hitselberger*, 991 F. Supp. 2d at 141 ("The technique used here is not even close to the calculated two-step inquiry in Siebert. The agents only asked general questions, with the purpose of establishing rapport with Mr. Hitselberger, not to elicit a confession."). Here, the warnings were appropriately timed to serve their intended purpose of notifying the defendant of his rights before he might say something incriminating. Accordingly, *Seibert* is simply inapplicable to the facts of this case and does not bar admission of the defendant's statements *en route* to the United States.

In sum, then, Agustin's October 2015 statements are admissible, and his motion to suppress is denied.

## IV.    DEFENDANTS' MOTIONS CHALLENGING PARTS OF INDICTMENTS

The defendants challenge two aspects of the indictments. First, the defendants individually and jointly move to dismiss the firearms charge for violation of 18 U.S.C. § 924(c) in Count Two. The defendants allege that § 924(c) does not apply extraterritorially and, thus, that the government cannot prosecute the defendants under § 924(c) for any alleged acts that occurred outside the United States. Defs.' Mot. to Dismiss Count II ("Defs.' Mot. to Dismiss"), ECF No. 50. The defendants also aver that Count Two of the indictments is "facially defective" because the indictments do not adequately provide the defendant "sufficient information to defend themselves against the charge." *Id.* at 2. Second, both defendants have moved separately, pursuant to Federal Rule of Criminal Procedure 7(d), "to strike from the Indictment" any reference to the defendants using aliases. Agustin's Mot. Strike Aliases at 1, ECF No. 53;

Panfilo's Mot. Strike Aliases at 1, ECF No. 56.  For the reasons stated below, these three motions are denied.

### A.  Defendants' Motions to Dismiss Count Two

The defendants individually and jointly move to dismiss Count Two of their respective indictments, which charge each defendant with using, carrying or brandishing a firearm during or in relation to drug crime, in violation of 18 U.S.C. § 924(c).  Defs.' Mot. to Dismiss.  The defendants argue that Count II must be dismissed for two reasons.  First, the defendants aver that § 924(c) does not apply extraterritorially, and that the government cannot prosecute the defendants for conduct that occurred outside the United States.  *Id.* at 1.  Second, the defendants contend that the indictments "fail[] to provide either defendant [with] sufficient information to defend themselves against the charge," and "do not identify what weapons were allegedly possessed by either defendant."  *Id.* at 2.  Accordingly, the defendants assert that the indictments fail to comply with Federal Rule of Criminal Procedure 7(c)(1), which requires that an Indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  FED. R. CRIM. P. 7(c)(1).  Neither argument has merit, and the motion is denied.

### 1.  *Relevant Legal Standard*

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.  FED. R. CRIM. P. 12(b)(1).  Such motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  FED. R. CRIM. P. 12(b)(3)(B).  Although a court's supervisory powers provide it with the authority to

dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

    2.   *Extraterritorial Application of § 924(c)*

    It is well-established that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (internal quotation marks omitted). "Unless contrary intent appears," however, "all statutes, without exception, [should] be construed to apply within the United States only." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004) (internal quotation marks omitted); *see also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."); *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (explaining that the presumption against extraterritorial application provides that "'[w]hen a statute has no clear indication of an extraterritorial application, it has none'" (quoting *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 261 (2010)). "[N]otwithstanding th[is] presumption against extraterritoriality, a statute will be construed to apply extraterritorially if Congress gives a 'clear indication' of that intention." *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) (quoting *Morrison*, 561 U.S. at 255).

    "[I]n examining [a] statute for congressional intention of extraterritorial application, [a court] should consider both contextual and textual evidence." *Delgado-Garcia*, 374 F.3d at 1345. The defendants argue that "[n]either the plain language of the statute, nor any legislative history suggests—directly, indirectly, or otherwise—a Congressional intent to create criminal liability in federal court in the United States for the possession of a firearm outside our national

borders." Defs.' Mot. to Dismiss at 1.[15]  Section 924(c) penalizes "any person who, during and

in relation to any crime of violence or drug trafficking crime . . . for which the person may be

prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any

such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of

violence or drug trafficking crime . . . be sentenced," as set forth in the statute, 18 U.S.C.

§ 924(c)(1)(A).

The defendants argue that because "the statute does not make any specific reference to

the possession of a firearm outside of the United States, . . . there is no 'clear, affirmative

indication' that Congress intended the statute to apply extraterritorially."  Defs.' Mot. to Dismiss

at 8.  "Section 924(c) crimes are not ordinary substantive offenses, however." *United States v.*

*Abu Khatallah*, 151 F. Supp. 3d 116, 136 (D.D.C. 2015).  "They depend on the commission of a

concurrent—and predicate—'crime of violence'" or drug trafficking crime.  *Id. see also* 18

U.S.C. § 924(c)(1)(A).  The D.C. Circuit has held that "the extraterritorial reach of an ancillary

offense . . . is coterminous with that of the underlying criminal statute." *United States v. Ali*, 718

F.3d 929, 939 (D.C. Cir. 2013) (citing *United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir.

2005)).  Thus, courts have universally held that where the predicate offense applies

extraterritorially, so does § 924(c).  *See, e.g.*, *Khatallah*, 151 F. Supp. 3d at 136; *United States v.*

*Shibin*, 722 F.3d 233, 247 (4th Cir. 2013) (stating that because the defendant "could be

---

[15]    Notably, the government asserts that it "anticipates introducing at trial" evidence of Agustin and a co-conspirator "discussing and coordinating the purchase of weapons in the United States for transportation into Mexico." Gov't's Opp'n Defs.' Mot. to Dismiss at 5, ECF No. 63.  The government further anticipates introducing testimony from witnesses regarding the defendants' "aiding and abetting the use, carrying, brandishing, and/or possession of a firearm in the United States during and in relation to and/or in furtherance of drug trafficking." *Id.* Thus, to the extent the government is offering evidence of domestic violations of § 924(c), Count II may not be dismissed for lack of extraterritorial application, although this proffered evidence may raise other admissibility issues under, for example, Federal Rules of Evidence 403 and/or 404(b). *See* Defs.' Reply Supp. Mot. to Dismiss at 2, ECF No. 78.

prosecuted in the United States for hostage taking and maritime violence, he could also be prosecuted under § 924(c) for possessing, using, or carrying a firearm in connection with those crimes"); *United States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012) (holding that § 924(c) applies extraterritorially where "the underlying substantive criminal statutes apply extraterritorially"); *United States v. Belfast*, 611 F.3d 783, 814 (11th Cir. 2010) (upholding extraterritorial application of § 924(c) where torture was the predicate offense); *United States v. Ahmed*, 94 F. Supp. 3d 394, 413 (E.D.N.Y. 2015) (holding that § 924(c) applies extraterritorially where "the predicate crimes of violence relate to international terrorism, and . . . Congress clearly and explicitly gave those statutes extraterritorial effect"); *United States v. Mardirossian*, 818 F. Supp. 2d 775, 777 (S.D.N.Y. 2011) ("[Section] 924(c) applies extraterritorially where the Government can prosecute a defendant's underlying extraterritorial 'crime of violence or drug trafficking crime.'"); *United States v. Hasan*, 747 F. Supp. 2d 642, 684 (E.D. Va. 2010) (holding that § 924(c) applies extraterritorially where the predicate acts include crimes on the high seas); *United States v. Reumayr*, 530 F. Supp. 2d 1210, 1219 (D. N.M. 2008) (holding that § 924(c) applies extraterritorially in a bombing plot where the charges were predicated on 18 U.S.C. § 844(i), which the court held to apply extraterritorially); *United States v. Bin Laden*, 92 F. Supp. 2d 189, 201 (S.D.N.Y. 2000) (holding that § 924(c) applied to bombings of United States embassies in East Africa because the predicate charges under 18 U.S.C. §§ 844(f)(1), (3) apply extraterritorially); *United States v. Emmanuel*, Crim. No. 06-20758, 2007 WL 2002452, at *13 (S.D. Fla. July 5, 2007) (holding that § 924(c) applies extraterritorially "because the predicate 'crime of violence,'" violation of the Torture Act, "is one that 'may be prosecuted in a court of the United States'").

The defendants argue that the Supreme Court has stated that § 924(c) is an offense that is "distinct from the underlying federal felony." Defs.' Reply Supp. Mot. to Dismiss at 3, ECF No. 78. In this case, the underlying predicate offense charged in Count One of the respective indictments, 21 U.S.C. § 959, is a "drug trafficking crime" for the purposes of § 924(c) because it is a felony punishable under the Controlled Substance Import and Export Act. 18 U.S.C. § 924(c)(2). Clearly, § 924(c) is a "distinct" offense from the underlying predicate offense of § 959 as "each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). This does not mean, however, that § 924(c) is not an "ancillary" offense for purposes of the extraterritoriality analysis. A successful prosecution for § 924(c) still depends on the commission of an underlying predicate offense, and the D.C. Circuit has been clear that "the extraterritorial reach of an ancillary offense . . . is coterminous with that of the underlying criminal statute." *Ali*, 718 F.3d at 939.

Section 959 has an explicit provision providing for extraterritorial application, stating that "[t]his section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." 18 U.S.C. § 959(d). Accordingly, because the predicate offense has extraterritorial reach, § 924(c) also applies extraterritorially in this case.[16]

---

[16] In a footnote, the defendants dismiss the decision in *Abu Khatallah* as "not binding on this Court" and criticizes the reasoning as "inconsistent with the Supreme Court's explicit holding in *Morrison* that the presumption against extraterritoriality applies to 'all' cases and the test for determining extraterritorial application articulated in *RJ* [sic] *Nabisco*." Defs.' Mot. to Dismiss at 8 n.2. This cursory argument is not persuasive. Although *Morrison* established a presumption against extraterritorial application that applies to all statutes, this presumption may be rebutted when Congress provides evidence of an "affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). In this particular case, the Supreme Court's decision in *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016), is instructive. In *RJR Nabisco*, the Supreme Court considered whether two provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO") applied extraterritorially. With respect to RICO's substantive provisions, contained in § 1962, the Supreme Court concluded that the presumption against extraterritoriality had been rebutted but only with respect to *predicates* of § 1962 "that plainly apply to at least some foreign conduct." *Id.* at 2101. Thus, *RJR Nabisco* is entirely consistent with the universal view of courts that § 924(c) applies extraterritorially where the underlying predicate violation expressly rebuts the presumption against extraterritoriality. Here, that is clearly the

### 3. Sufficiency of the Indictment

The defendants also argue that "the Indictment fails to provide either defendant sufficient information to defend themselves against the charge" in Count Two and thus is "facially defective." Defs.' Mot. to Dismiss at 2, 10. According to defendants, the indictments "contain only a boilerplate recitation of the criminal statute," "allege[] conduct that took place during a multi-year time frame, in unspecified international locations, and there is no precision as to what weapons were possessed or whether the defendants 'used, carried or brandished' the firearm(s)." *Id.* at 10. In support, the defendants primarily rely on Federal Rule of Criminal Procedure 7(c)(1) and two U.S. Supreme Court cases, *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960), asserting that "[a]n indictment must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he prosecuted based upon the facts presented to the grand jury." *Id.* at 9.

### a. Relevant Legal Standard

"[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). "Rather, to be sufficient, an indictment need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *Id.*; *see also United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (stating that an "indictment's main purpose is 'to inform the defendant of the nature of the accusation against

---

case because the predicate offense, as set forth in 18 U.S.C. § 959(d), expressly provides for extraterritorial application.

him'" (quoting *Russell v. United States,* 369 U.S. 749, 767 (1962)). "[A]n indictment must "first, contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend, and, second, enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hitt,* 249 F.3d at 1016 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (alterations adopted); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). Thus, Federal Rule of Criminal Procedure 7(c)(1) states that an indictment need only contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). In most cases, detailed allegations "surely are not contemplated by Rule 7(c)(1) . . . ." *Resendiz-Ponce*, 549 U.S. at 109. The Federal Rules of Criminal Procedure were "designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure." *Id.* (internal quotation marks omitted). Generally speaking, an indictment "may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." *United States v. Colon*, 628 F.2d 150, 155 (D.C. Cir. 1980). [17]

    *b.  Analysis*

    In this case, Count Two of the indictments satisfies Rule 7(c)(1) and adequately informs the defendants of the § 924(c) offenses with which they are charged and enables them "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hitt*, 249 F.3d at

---

[17]    An indictment that restates the language of a federal criminal statute is ordinarily sufficient, *Resendez-Ponce*, 549 U.S. at 109, except that certain crimes require greater specificity in the indictment, *Russell*, 369 U.S. at 749. For example, an indictment for a violation of 2 U.S.C. § 192—which prohibits a congressional committee witness from refusing to answer any question "pertinent to the question under inquiry"—must include the subject of the congressional hearing so that the defendant may determine whether the defendant's refusal to answer was "pertinent to the question under inquiry." *Id.* Accordingly, "[w]here guilt depends so crucially upon such a specific identification of fact," an indictment that merely restates the language of the criminal statute is insufficient. *Id.* at 764.

1016. The defendants primarily argue that the indictments for Count Two must be dismissed because they do not identify specific weapons, specify where and when the weapons were possessed, or state whether weapons were "used, carried or brandished." Defs.' Mot. to Dismiss at 2, 10. As noted above, however, a violation of § 924(c) depends on a predicate offense; in this case, the predicate offense is the drug trafficking crime charged in Count One, which charges the defendants with conspiracy to distribute cocaine, methamphetamine, heroin, and marijuana for importation into the United States. Count Two provides general detail as to the places where the offenses were committed: namely, Mexico and the United States. *See, e.g.*, Indictment as to Panfilo Flores Apodaca ("Panfilo Indictment") at 1, ECF No. 1.

In addition to "where" the offenses were allegedly perpetrated, the indictment also states "when" they were allegedly committed. The indictments state that Agustin committed the § 924(c) offense from July 2010 to May 2012, and Panfilo committed the same offense from January 2005 to the filing date of the indictment, March 13, 2014. *See* Agustin Indictment at 2; Panfilo Indictment at 2.

To be sure, the indictments do not specify a particular weapon that was possessed. The defendants, however, do not cite any legal authority for the position that an Indictment for § 924(c) must identify a specific firearm. That said, the Indictments do cite § 924(c)(1)(B)(ii), which provides for a sentence of imprisonment of not less than thirty years if the firearm possessed "is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler." *See, e.g.*, Panfilo Indictment at 3. Thus, the indictments do provide significant detail as to the kind of firearms that were allegedly used by the defendants triggering a mandatory minimum penalty. Further, although the indictments do not specify whether the firearms were "used, carried or brandished," "it is well established that if a criminal statute

44

disjunctively lists multiple acts with constitute violations, 'the prosecution may in a single count

of an indictment or information charge several or all of such acts in the conjunctive and under

such charge make proof of any one or more of the acts, proof one alone, however, being

sufficient to support a conviction.'" *United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007)

(quoting *District of Columbia v. Hunt*, 163 F.2d 833, 837–88 (D.C. Cir. 1947) (citing *Crain v.

United States*, 162 U.S. 625 (1896))); *see also United States v. Joseph*, 169 F.3d 9, 13 (D.C. Cir.

1999) (explaining that "[t]his rule applies to § 924(c)(1) indictments drafted in the conjunctive,

which can support a conviction if the jury is charged and the violation is proved disjunctively"

(citing *United States v. Dickey*, 102 F.3d 157, 164 n.8 (5th Cir. 1996)).[18]

Additionally, although not included in the indictments, the government has since filed

supplemental briefing which includes details of the defendants' past use, carrying, or brandishing

of firearms in relation to their drug trafficking activities. The government states that it is

prepared to present testimony from cooperating witnesses that both defendants "personally

---

[18]    The defendants' reliance on *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. 2017), is misplaced. In *Hillie*, the court held that an indictment inadequately stated violations of child pornography statutes, because the charges did not "specify the nature of the sexual acts that relate to [the defendant's] unspecified conduct involving video depiction, let alone the manner of his actual or attempted video recording of any such sexual act." *Id.* at 74. Noting the broad language in the child pornography production statute, 18 U.S.C. § 2251(a), which "proscribes a wide array of conduct in the broadest, most generic terms," and in the child pornography possession statute, 18 U.S.C. § 2252(a), which also uses a term that can "take on several different, but related, meanings," *id.* at 75, the court held that the indictments failed to provide "an explanation of *how* [the defendant] allegedly violated those statutes," *id.* at 76 (citing *United States v. Nance*, 533 F.2d 699, 701 (D.C. Cir. 1976) ("The United States Supreme Court has stated: 'Where guilt depends so crucially upon . . . a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.'" (alteration in original; quoting *Russell*, 369 U.S. at 767))), and such an omission was insufficient, *id.* The indictment stated only that the defendant "did something involving visual depictions of sexually explicit conduct of a minor 'in the District of Columbia' during periods of time that span two to three years" and "[t]he indictment is barren of factual averments regarding the what, where, or how of [the defendant's conduct], and thus, a non-clairvoyant reader cannot possibly ascertain the substance of the government's accusations from the face of the charging instrument." *Id.* at 72. In contrast to the statutes at issue in *Hillie*, however, § 924(c) does not "proscribe[] a wide array of conduct in the broadest, most generic terms," but makes specific conduct—the use, carrying or brandishing of a firearm during a crime of violence or drug trafficking crime—a federal crime. As the predicate "drug trafficking crime" is clearly stated in Count One, the indictments provide sufficient information so that the reader can "ascertain the substance of the government's accusations from the face of the charging instrument."

possessed and carried firearms, including various handguns and AK-47 assault rifles, during the course of their drug trafficking activities, including while driving in their vehicles in the course of their drug trafficking duties." Gov't Second Supp. Supp. Mot. Introduce Co-Conspirator Statements, Other Crimes Evidence at Trial, and Allow Lead Agents at Counsel Table ("Gov't Second Supp.") at 3, ECF No. 94. In addition, the government anticipates presenting testimony regarding the following incidents of violence that support the firearms charge in Count Two of each indictment:

> (i) In approximately December 2009, "in the town of El Burrion in the state of Sinaloa, Mexico," Agustin, "armed with a 'five-seven' pistol and an AK-47 selective-fire assault rifle," and Panfilo, "armed with a .45 inch caliber handgun and an AK-47," were present "helping the injured after the shootout" involving members of the MF-DTO. *Id.* at 4. On this occasion, the government alleges that "[m]ultiple people were shot, causing injury and death." *Id.*

> (ii) In September 2010, Agustin made efforts to trade drugs for .50 caliber machine guns in the United States for use against rival drug cartels. *Id.* at 5.

> (iii) In October 2013, Panfilo, and other co-conspirators, attending a family wedding in Santa Maria del Oro in the state of Nayarit, Mexico fled from Mexican Marines and had in their possession AR-15 semi-automatic rifles, AK-47 selective-fire assault rifles and "larger caliber weapons." Id. at 6. During the flight from the Marines, a shootout ensued. *Id.* at 5–6.

With this evidence, the defendants have been apprised of allegations that specific types of firearms were used, carried, or brandished by both defendants at a particular place in Mexico in a narrow timeframe.

46

For these reasons, Count Two of the indictments satisfy Rule 7(c)(1)'s command of a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Read in conjunction with Count One, the language of Count Two, further bolstered by the government's supplemental briefing, sets forth sufficient information so that the defendants are aware of the offense with which they are charged and so that they can prepare an adequate defense or avoid double jeopardy. *See Resendiz-Ponce*, 549 U.S. at 108.

### 4. Conclusion

For the foregoing reasons, § 924(c) clearly applies extraterritorially in this case because the underlying predicate offense, a drug trafficking crime, explicitly rebuts the presumption against extraterritorial application of statutes. Further, Count Two of the indictments adequately informs the defendants of the offense with which they are charged and provides sufficient information so that they can mount a defense and plead double jeopardy in any further prosecution for the same offense. Moreover, § 924(c) is not a federal crime for which greater specificity of fact is required. Accordingly, the defendants' joint motion to dismiss Count Two of the indictments is denied.

### B. Defendants' Motions to Strike Improper Aliases

The indictments against the defendants include in the captions and each of the two counts the aliases allegedly used by each defendant. Agustin's three referenced aliases are "El Nino," "El Barbon," and "El Ingeniero," which this defendant translates, respectively, as "the boy," "the bearded one," and "the engineer." Agustin's Mot. Strike Aliases at 1, ECF No. 53. Panfilo's single referenced alias is "Charmin," which he describes as "a nickname" that he concededly used as his Blackberry screen name and, further, was "referred to by this name by others." Panfilo's Mot. Strike Aliases at 1, ECF No. 56. Both defendants have moved separately,

pursuant to Federal Rule of Criminal Procedure 7(d), "to strike from the Indictment" any reference to the defendants using their aliases as surplusage.  Agustin's Mot. Strike Aliases, at 1; Panfilo's Mot. Strike Alias at 1 (joining Agustin's arguments).  Agustin also seeks to strike any reference to his aliases from "transcripts of recorded conversations (prepared by the Government)," Agustin's Mot. Strike Aliases at 1, while Panfilo "does not seek to prohibit the use of the nickname during the Government's case-in-chief as it would appear that the Defendant identified himself by it," Panfilo's Mot. Strike Aliases at 2. These motions are denied.

    *1. Relevant Legal Standard*

    Federal Rule of Criminal Procedure 7(d) authorizes the Court "[u]pon the defendant's motion, [to] . . . strike surplusage from the indictment or information," but does not define what constitutes "surplusage."  The meaning may be gleaned from the context of same rule, which requires, in Rule 7(c)(1) regarding the "Nature and Contents" of an indictment or information, that these charging documents provide "a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." FED. R. CRIM. P. 7(c).  Consequently, words used to describe essential facts relevant to the offense are not surplusage subject to being stricken.  The D.C. Circuit has made clear that a motion to strike surplusage "should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir.1998); *see also United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997) ("Material that can fairly be described as 'surplus' may only be stricken [from an indictment] if it irrelevant and prejudicial."); 1 Charles Alan Wright & Andrew D. Leipold, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 4th § 128 at 643 (2008) ("[A] motion to strike surplusage should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.").

"[T]he striking of surplusage from an indictment, although *permissible*, is by no means mandatory," and is left to the discretion of the Court. *United States v. Watt*, 911 F. Supp. 538, 554 (D.D.C. 1995) (emphasis in original); *see also United States v. Edmond*, 52 F.3d 1080, 1112 (D.C. Cir. 1995) (noting that the denial of motions to strike surplusage is reviewed for abuse of discretion). Indeed, "[m]otions to strike surplusage from an indictment are highly disfavored in this Circuit." *United States v. Singhal*, 876 F. Supp. 2d 82, 102 (D.D.C. 2012); *see also United States v. Jordan*, 626 F. 2d 928, 930 n.1 (D.C. Cir. 1980).

2. *Analysis*

According to Agustin, striking his aliases as surplusage is warranted because (1) "it does not appear that [Agustin] used or was known by the aliases contained in the Indictment," Agustin's Mot. Strike Aliases at 2; and (2) "the inclusion of the aliases in the Indictment" is not necessary to identify the defendant or "connect him to the charged offenses, *id*. at 2–3.[19] As support for his argument, Agustin points to the government's draft transcripts of four recorded telephone conversations between Agustin and a confidential informant, which transcripts the government intends to use at trial. Apparently, the headings of the draft transcripts identify this defendant using his alias "Nino," despite the fact that this alias "is never mentioned in the conversation." Agustin Mot. Strike Aliases at 3.[20] Given his view that "[t]he probative value of the alleged alias is *de minimis*," Agustin argues that "the mere suggestion by the Government

---

[19]    Plainly, given Panfilo's acknowledgement that he used and was known by his nickname, "Charmin," these two arguments cannot apply to him. Panfilo's Mot. Strike Aliases at 1; *see also* Gov't's Opp'n to Agustin and Panfilo's Mots. Strike Aliases at 3, ECF No. 65 (anticipating that witnesses will refer to Panfilo as "Charmin" during trial testimony consistent with their witness interviews).

[20]    The government has agreed to delete from each transcript and the recorded calls an introductory statement by an FBI agent describing the recorded conversation as between a confidential "source" and Agustin Flores-Apodaca, also known as "El Nino, El Barbon and El Ingeniero," before this evidence is admitted at trial. Agustin's Mot. Strike Aliases at 3 n.1; Gov't's Opp'n to Agustin and Panfilo's Mots. Strike Aliases at 2 n.2, ECF No. 65.

that the defendant used or was known by the alias *El Nino* (or any other alias) is unfairly prejudicial as it suggests some nefarious need for a secret or hidden name by the defendant to hide his true identity from law enforcement." Agustin's Mot. Strike Aliases at 4.[21]

In response, and contrary to Agustin's assertion that the aliases listed in the indictment and on the draft transcripts are "the Government's own invention," Agustin's Mot. Strike Aliases at 3, the government proffers that (1) the cooperating witness involved in the recorded calls with Agustin will refer to this defendant using the three aliases; (2) in one recorded call with Agustin, the cooperating witness says, "Ingeniero," to which Defendant Agustin responds, "Yes."; (3) in another recorded call between the cooperating witness and a co-conspirator, the latter refers to Agustin as "Ingeniero;" (4) the contact list in a cell phone seized from a co-conspirator uses the contact name "Nino" for Agustin's known telephone number, which was also used for consensually recorded calls with Agustin; and (5) the witnesses will refer to Agustin by all three aliases during their trial testimony, consistent with their references to Agustin during witness interviews. Gov't's Opp'n to Agustin and Panfilo's Mots. Strike Aliases at 2–3, ECF No. 65.

The government's proffer regarding Agustin's use of the listed aliases in recorded telephone calls and in his contacts with alleged co-conspirators, and Panfilo's admitted use of his alias, sufficiently show that these aliases are relevant to establishing the defendants' identities and participation in the charged offense conduct. *See United States v. Palfrey*, 499 F. Supp. 2d 34, 40 (D.D.C. 2007) (denying defense motion to strike three aliases listed in indictment "[b]ecause the Government credibly asserts that these aliases are necessary to identify Defendant

---

[21]    Agustin also complains that "the practice in this jurisdiction" of "leav[ing] a copy of the Indictment with the jurors during deliberation . . . would create a significant potential for unfair prejudice if the aliases remain included in the document." Agustin's Mot. Strike Aliases at 3. This Judge's practice is not to provide a stand-alone copy of the indictment to the jury during deliberations, but to incorporate the charges as part of the final instructions, a written copy of which is provided to the jury during deliberations.

at trial, and because Defendant has shown no prejudice inherent in those aliases"); *United States v. Brodie*, 326 F. Supp. 2d 83, 90 (D.D.C. 2004) ("The general rule regarding the use of aliases is that 'if the government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted.'") (internal citation omitted); *United States v. McFarlane*, 491 F.3d 53, 61 (1st Cir. 2007) ("Where the use of an alias is important to the government's case, its submission to the jury as part of the indictment is permissible.").

Moreover, as both defendants conceded during the August 2, 2017 hearing, the aliases themselves are not in any way inflammatory or prejudicial. Instead, the defendants contend that the use of any alias, no matter how innocuous, carries some prejudice by implying that the defendant was engaged in "nefarious" activity. To the extent that the use of an alias in communications regarding illegal activity may be construed as an effort to conceal or mask the defendant's identity from law enforcement, the Court agrees that this may be prejudicial but not unfairly so. *See, e.g.*, *United States v. Pippenger*, 552 F. Supp. 2d 990, 997 (D.S.D. 2008) (denying a motion to strike aliases because, "[w]hile the use of an alias may tend to be prejudicial, such prejudice is not unfair because it is the means by which many of the defendants were known in the community"). In any event, the testifying witnesses are anticipated to refer to the defendants by their aliases while testifying, presumably because this is how the defendants were known to those witnesses. In such circumstances, the use of the defendants' aliases both in the indictment and in connection with the presentation of evidence at trial, through witness testimony and in transcripts of recorded or intercepted communications, is not unfairly prejudicial. *See United States v. Clark*, 184 F.3d 858, 869–70 (D.C. Cir. 1999) (affirming the

51

denial of a defense motion to strike an alias from the indictment, since the "alias was not irrelevant," given that the defendant identified himself to the police with an alias, and rejecting the defense argument of prejudice since "the jury properly learned of defendant's use of the [alias] through the officer's testimony that defendant gave the name when arrested").

Accordingly, the defense motions to strike the references to their aliases from the indictments and transcripts, which are to be introduced at trial, as surplusage, under Federal Rule of Criminal Procedure 7(d), is denied.

## V.    CONCLUSION

For the foregoing reasons, the following seven motions filed by the defendants are denied: (1) Agustin's Motion *in Limine* to Preclude Introduction of Post-Arrest Title III Intercepts, ECF No. 51; (2) the defendants' Joint Motion for Pretrial Hearing of Admissibility of Alleged Co-Conspirator Statements, ECF No. 52; (3) Agustin's Motion to Enforce the Rule of Specialty, ECF No. 54; (4) Agustin's Motion to Suppress Statements, ECF No. 48; (5) the defendants' Joint Motion to Dismiss Count Two of Indictments, ECF No. 50; and (6) the defendants' separate Motions to Strike Improper Aliases, ECF Nos. 53 and 56. The portions of the government's motion addressed in this Memorandum Opinion are granted. An appropriate Order accompanies this Memorandum Opinion.

Date: August 17, 2017

_____
BERYL A. HOWELL
Chief Judge