# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

UNITED STATES OF AMERICA,

         Plaintiff,

         v.

AGUSTIN FLORES APODACA and
PANFILO FLORES APODACA,

         Defendants.

</td><td>

Criminal Action No. 14-57 (BAH)

Chief Judge Beryl A. Howell

</td></tr>
</table>

## MEMORANDUM OPINION

This is the third opinion issued in this case. *See United States v. Apodaca* ("*Apodaca I*"), 251 F. Supp. 3d 1, 2 (D.D.C. 2017) (granting the government's motion to enforce two administrative subpoenas); *United States v. Apodaca* ("*Apodaca II*"), Crim. No. 14-57 (BAH), 2017 U.S. Dist. LEXIS 131617, at *73 (D.D.C. Aug. 17, 2017) (resolving pretrial motions).[1] Having already resolved eight pretrial motions in *Apodaca II,* six additional pretrial motions have now become ripe in advance of the trial, which is scheduled to begin on February 5, 2018.[2] The defendants, Agustin Flores Apodaca ("Agustin") and Panfilo Flores Apodaca ("Panfilo"),

---

[1] The following pretrial motions were denied in *Apodaca II*: (1) Agustin Flores Apodaca's ("Augustin") Motion *in Limine* to Preclude Introduction of Post-Arrest Title III Intercepts, ECF No. 51; (2) the defendants' Joint Motion for Pretrial Hearing of Admissibility of Alleged Co-Conspirator Statements, ECF No. 52; (3) Agustin's Motion to Enforce the Rule of Specialty, ECF No. 54; (4) Agustin's Motion to Suppress Statements, ECF No. 48; (5) the defendants' Joint Motion to Dismiss Count Two of Indictments, ECF No. 50; and (6) and (7) the defendants' separate Motions to Strike Improper Aliases, ECF Nos. 53 and 56. *See Apodaca II*, 2017 U.S. Dist. LEXIS 131617, at *73. The government's Motion to Introduce Co-Conspirator Statements, Other Crimes Evidence at Trial, and Allow Lead Agents at Counsel Table, ECF No. 55, was granted in part, with a ruling on the portion of that motion seeking admission of intrinsic or other bad acts, under Federal Rule of Evidence 404(b), reserved pending supplemental briefing, *id.* at *4, *74. This part of the government's Motion to Introduce Other Crimes Evidence, ECF No. 55, as well as the government's Motion *in Limine* Related to Jencks Material and Certain Cross-Examination by Defense Counsels, ECF No. 110, are not yet ripe for resolution.

[2] The trial was originally scheduled for September 18, 2017, but was postponed until February 5, 2018, at the defendants' request for additional time to conduct further investigation following the government's disclosure, in connection with its Motion to Introduce Other Crimes Evidence, ECF No. 55, of anticipated evidence to be introduced at trial. Min. Order (dated Aug. 28, 2017).

who are indicted separately on two substantively similar counts of conspiring to traffic controlled substances and possessing a firearm in furtherance of the same, have filed five of the pending motions: (1) the defendants' Joint Motion to Suppress Title III Intercepts ("Defs.' Mot. Suppress T. III Intercepts"), ECF No. 33; (2) Agustin's Motion to Compel Discovery ("Agustin's Discovery Mot."), ECF No. 40; (3) Panfilo's Motion to Join and Supplement Agustin's Motion to Compel Discovery ("Panfilo's Discovery Mot."), ECF No. 41; (4) an amendment thereto ("Panfilo's Am. Discovery Mot."), ECF No. 45; and (5) Agustin's Motion for *In Camera* Inspection of Grand Jury Minutes ("Def.'s Mot. GJ Inspection"), ECF No. 130. Also ripe for resolution is the government's Motion to Reconsider Use of Blackberry Communications Transcripts ("Gov't's BBMT Mot."), ECF No. 95.

The pending motions are addressed in the following order: Part I discusses the defendants' four motions seeking suppression of intercepted BlackBerry text messages and related discovery, ECF Nos. 33, 40, 41, and 45; Part II discusses the government's motion seeking reconsideration of the use at trial of certain transcripts of intercepted BlackBerry messages, ECF No. 95; and, finally, Part III discusses Agustin's motion for *in camera* inspection of grand jury minutes, ECF No. 130.[3]

The general factual and procedural background in this case has been amply described in *Apodaca II*, 2017 U.S. Dist. LEXIS 131617, at *4–13, and will not be repeated here.

---

[3] The defendants and government filed certain of the pending motions and related briefing under seal, with those papers subsequently unsealed, in full or in part, at the direction of this Court. See Min. Order (dated Sept. 5, 2017); Min. Order (dated Sept. 15, 2017). Any parts of documents that remain under seal and are discussed in this Memorandum Opinion, including ECF Nos. 68-1, 68-2, are unsealed to the extent discussed herein in order to make the reasoning intelligible.

## I. DEFENDANTS' CHALLENGES TO TITLE III INTERCEPTED COMMUNICATIONS

As part of a multi-prong challenge to the government's introduction of Title III intercepts at trial, the defendants have jointly moved to suppress "any and all communications intercepted by the Government pursuant to . . . Title III," on the ground that the orders authorizing the intercepts were "facially insufficient." Defs.' Mot. Suppress T. III Intercepts at 1.[4] If their suppression motion is denied, the defendants seek to compel discovery of "[a]ll interceptions from the Title III investigation, from all target devices," including "[m]inimized interceptions of Defendant Panfilo." Jt. Stm. Regarding Discovery ("Jt. Stm. Discovery") ¶ 7, ECF No. 124; Agustin's Discovery Mot at 1; Panfilo's Discovery Mot. at 1; Panfilo's Am. Discovery Mot at 1. The defendants' suppression motion, followed by their motions to compel discovery, are discussed in turn.

### A. Defendants' Joint Motion to Suppress Title III Intercepts

The government conducted a 22-month wiretap investigation between February 2013 and December 2014, during which the government submitted and obtained 27 applications for electronic intercepts and ultimately intercepted "thousands of pertinent electronic communications (Blackberry Messenger text messages ['BBMs'])" from "over [59] different devices." Gov't's Opp'n Defs.' Mot. Suppress T. III Intercepts ("Gov't's First Opp'n T. III Intercepts") at 2–3, ECF No. 68. The first wiretap application and order targeted the electronic communications of Panfilo, who was using "Target Device 1." *Id.* at 3–4. Over the course of the investigation, three additional BlackBerry devices used by Panfilo were subject to court-

---

[4]     Three of the defendants' previously-denied motions also challenged the introduction of intercepted communications. *See Apodaca II*, 2017 U.S. Dist. LEXIS 131617, at *13–33 (denying defendants' motions to preclude introduction of post-arrest Title III Intercepts, hold a pre-trial hearing on the admissibility of alleged co-conspirator statements, and enforce Rule of Specialty).

authorized interception. *Id.* In total, "[t]he government intercepted approximately 12,500 pertinent electronic communications between Panfilo and other [alleged] co-conspirators." *Id.* at 4. Apparently, these pertinent BBMs of Panfilo's were intercepted during thirteen months in 2013 and 2014: February through October, 2013, and May, June, July, and December 2014. *See* Gov't's Opp'n Defs.' Mot. Compel Discovery ("Gov't's Opp'n Defs.' Discovery Mots.") at 3–4, ECF No. 44 (listing "periods of time" in which intercepted communications "are between Panfilo and various co-conspirators"); Defs.' Suppl. Reply Supp. Mot. Suppress T. III Intercepts ("Defs.' Second Reply Mot. Suppress T. III Intercepts") at 4 n.1, ECF No. 92-2 (noting that Panfilo's Blackberry "was not intercepted during the period after October 2013 except for 30 day periods on or about May, July, and December 2014"). Agustin was imprisoned during the interceptions, and none of his communications were intercepted. Gov't's First Opp'n T. III Intercepts at 4.

The government's initial application, seeking to intercept electronic communications over Target Device #1 was granted by the District Court in the Western District of Texas, on February 19, 2013. *See id.* at 2–3; *see also id.*, Ex. 1, Application for Interception for Electronic Communications ("Initial T. III App.") ¶ 2, ECF No. 68-1; *id.*, Ex. 2, Order Authorizing the Interception of Electronic Communications ("Initial T. III Order") at 3–7, ECF No. 68-2. That first application and order, as well as the twenty-six that followed, all contained "the same information—a Government attorney's name in the application and order, and reference [to] the appropriately designated [Department of Justice ('DOJ')] official," as is required by 18 U.S.C. § 2516(3) for interceptions of electronic communications. Gov't's First Opp'n T. III Intercepts at 3. Although "the Government sought only to intercept electronic communications when it first applied for judicial authorization," the wiretap also intercepted some "wire (voice) communications," mostly "in the form of 'voice notes,'" which are in a compressed audio

Adaptive Multi-Rate ("AMR") file format. Gov't's' Third Suppl. Opp'n Defs.' Mot. Suppress T. III Intercepts ("Gov't's Fourth Opp'n T. III Intercepts") at 3–4, ECF No. 113. The interception of these voice notes, or AMR files, was due to BMM's functionality in transmitting both audio and text communications over the same network and the Blackberry service provider's inability to disaggregate the two formats of communications. Gov't's Suppl. Opp'n Defs.' Mot. Suppress T. III Intercepts ("Gov't's Second Opp'n T. III Intercepts") at 3–4, ECF No. 89. As the government explains, BBM is BlackBerry's "proprietary instant messaging service," and "[u]sers of BBM are able to attach video and audio files, including 'voice notes,' to standard text conversations and send these messages as BBM communications utilizing [BlackBerry's] network." *Id.* at 3. BlackBerry announced the voice notes functionality in December 2012, three months before the wiretap investigation in this case began. Defs.' Third Reply Supp. Mot. Suppress Title III Intercepts ("Defs.' Fourth Reply Mot. Suppress T. III Intercepts") at 2, ECF No. 129.

The government does not dispute that wire communications in the form of AMR files were intercepted, along with the court-authorized electronic communications. To deal with the occurrence of unauthorized intercepted wire communications, monitors at the reviewing site in El Paso, Texas were directed, in accordance with the instructions in the government's applications and orders, promptly to minimize such communications. Gov't's Second Opp'n T. III Intercepts at 4; *see also, e.g.*, Initial T. III App. at 8; Initial T. III Order at 6–7, ECF No. 68-2. The government instructed monitors not to listen to any unauthorized intercepted wire communications in both verbal instructions and in signs taped to monitors' computers that stated "Do Not Listen to Any Audio Files." Jt. Stm. Discovery ¶ 5. At trial, the government plans to

use as evidence only "lawfully intercepted electronic communications." Gov't's Opp'n Defs.' Discovery Mots. at 3–4.

The government has dribbled out information regarding the wiretaps, prompting over four rounds of briefing and two status conferences to clarify the basic facts related to this aspect of the government's investigation.[5] This approach to discovery is both unhelpful and unnecessarily time-consuming for the Court and the parties. Now, in the face of more complete discovery from the government, the defendants advance an evolved argument for suppression based on their understanding of the government's interceptions as being "hybrid" in nature and, as such, requiring authorization pursuant to the "'wire' standard," instead of the standard for electronic communications. Defs.' Fourth Reply Mot. Suppress T. III Intercepts" at 8–9; Defs.' Reply Gov't's Second Suppl. Opp'n Defs.' Mot. Suppress T. III Intercepts ("Defs.' Third Reply Mot. Suppress T. III Intercepts") at 4, ECF No. 104-2.[6]

---

[5]    The existence of the AMR files was first raised by defendants at an August 2, 2017 status hearing. *See* Gov't's Second Opp'n T. III Intercepts at 2 (discussing hearing). In subsequent submissions, the government acknowledged that 170 AMR files were sent by BlackBerry to the FBI's Data Intercept Technology Unit ("DITU") for review, and that 163 of these files were minimized and seven "were erroneously marked "pertinent" by a monitor. *Id.* at 3–4. The defendants also questioned the extent to which the government intercepted other types of wire communications, including 25 MP4 (video) and MP3 (audio, often music) files, in addition to AMR type wire communications. Defs.' Second Reply Mot. Suppress T. III Intercepts at 2. The government responded by explaining that "[t]he raw data exported for production in discovery to Defendants caused . . . three (3) unique MP4 files to be replicated within the raw data and to erroneously appear 25 different times within the raw data produced to the Defendants." Gov't's' Second Suppl. Opp'n Defs.' Mot. Suppress T. III Intercepts ("Gov't's Third Opp'n T. III Intercepts") at 5–6, ECF No. 101-2. With respect to the MP3 data, the government further explained that "MP3 files were not intercepted in this investigation and any reference to MP3 files within the communications is due to a feature of BBM which alerts a user when another contact is available." *Id.* at 13.

[6]    The defendants assert a new argument in their most recent brief as a "second – and independent – basis for suppression." Defs.' Fourth Reply Mot. Suppress T. III Intercepts at 2. Based on the government's assertion that it maintains "all the intercepted communications . . . on an FBI server in Quantico, Virginia," the defendants contend that the government has "fail[ed] to comply with the 'sealing' requirements of the Title III wiretap," and "[t]his failure warrants suppression of all the intercepts." *Id.* at 2, 11–12 (citing *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990); *United States v. Carson*, 969 F.2d 1480 (3d Cir. 1992)). "In *Ojeda Rios*, the Supreme Court held that tapes which were not sealed in a timely fashion under section 2518(8)(a) must be suppressed unless the government offers a satisfactory, 'objectively reasonable' explanation for the belated sealing." *Carson*, 969 F.2d at 1493 (finding 34-day delay in sealing for "necessity of enhancing original tapes" was not a satisfactory explanation). The government, in this case, after ordered to respond to this new argument, see Min. Order (dated Dec. 12, 2017), represents that "all target devices and interceptions were sealed by the authorizing court and there was no delay in the sealing." Gov't's Fourth Suppl. Opp'n Defs. Mot. Suppress at 1, 4, ECF No. 134. Only duplicate intercepts are

Specifically, the defendants reason that "the Government knew – or should have known" from the outset of the investigation that the wiretaps "would inevitably" capture both electronic and wire communications. *Id.*; Defs.' Second Reply Mot. Suppress T. III Intercepts at 7 (arguing that "the Government, with its expertise in the use of Blackberrys, knew BBM communications could or would invariably be a mixture of voice and audio communications"); Defs.' Reply Supp. Mot. Suppress T. III Intercepts at 4, ECF No. 82 (making same argument, citing Ian Austen, *BlackBerry Phones Get Free Calls Over Wi-Fi*, N.Y. TIMES (Dec. 10, 2012), https://bits.blogs.nytimes.com/2012/12/10/blackberry-phones-get-free-calls-over-wi-fi/). To underscore the point, the defendants cite the 170 AMR files intercepted, seven of which were erroneously marked "pertinent," as well as the government's representation that the first AMR file was intercepted on March 23, 2013, just over a month after the initial application in the wiretap, and that later wiretap affidavits and orders actually sought authorization to intercept wire communications. Defs.' Third Reply Mot. Suppress T. III Intercepts at 3; Defs.' Fourth Reply Mot. Suppress T. III Intercepts 2–7.[7] Given the interceptions of "hybrid"

maintained on the FBI servers in Quantico for investigative purposes, as permitted by the wiretap statute. *See* 18 U.S.C. § 2518(8)(a) ("Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of section 2517 of this chapter for investigations"); *id.* § 2517(1)–(2) (permitting investigative or law enforcement officer to disclose contents of a wiretap investigation to another officer or use content of the wiretap to the extent such disclosure or use "is appropriate to the proper performance of the official duties" of the officers involved). Accordingly, no statutory sealing violation has occurred, and the government's maintenance of intercepted communications for investigative purposes on FBI servers in Quantico does not present any statutory violation, let alone a violation supporting suppression.

[7]    As belatedly detailed by the government, during discrete time periods, after the first six months of the investigation, the government sought court authorization to intercept both wire and electronic communications, but only in five of the 27 applications and for only four devices not used by Panfilo out of the total 59 devices subject to the wiretaps. Gov't's Fourth Opp'n T. III Intercepts at 3–4 (noting the first of the five applications targeting wire and electronic communications was filed in August 2013); Defs.' Fourth Reply Mot. Suppress T. III Intercepts at 1 (listing the dates of the five applications for wire communications as August 12 and 30, 2013, January 27, 2014, August 14, 2014, and September 11, 2014); Gov't's Third Opp'n T. III Intercepts at 14–15 (noting that "[i]n the August 12 affidavit . . . the Government sought authority to intercept electronic communications over Target Device[] 1 (Panfilo's Device)," as well as "electronic . . . and wire communications over Target Device 10," which was not Panfilo's device). These facts show that had the government wished to target interception of Panfilo's *wire,* in addition to his *electronic,* communications, such authority would have been sought, as with the four devices subject to court-authorized wire interception.

7

communications, in the defendants' view, the government should have sought authorization "to intercept 'wire communications' *ab initio*," and such authorization, unlike for electronic communications, statutorily requires inclusion of the name of the authorizing high-ranking DOJ official on all applications and orders. *Id.* at 1. Absent the name of the authorizing high-ranking DOJ official, the defendants contend the interception orders are "facially defective" and must be suppressed under *United States v. Scurry*, 821 F.3d 1 (D.C. Cir. 2016). *Id.* at 1, 10. Thus, the defendants' challenge to the facial validity of the wiretap applications and orders rests on whether, in light of Blackberry's functionality and associated challenges in disaggregating different communication formats, the government was required to seek authorization to intercept wire communications and comply with statutory requirements applicable to wire communications, when only electronic communications were targeted for use at trial, with other communication formats minimized.

At the outset, the government concedes that the seven AMR files improperly marked as pertinent must be suppressed. Gov't's Fourth Opp'n T. III Intercepts at 5 (citing *United States v. Suggs*, 531 F. Supp. 2d 13, 24 (D.D.C. 2008), *aff'd sub nom. United States v. Glover*, 681 F.3d 411 (D.C. Cir. 2012)). The government posits, however, that suppression of the intercepted electronic communications is not warranted because the government only targeted electronic communications in connection with Panfilo and, thus, did not need to satisfy any different statutory authorization requirements applicable to wire communications with respect to those intercepts. *See id*. at 1. The fortuity "that voice notes can be transmitted over the BlackBerry system does little to alter the fact that the Government did not seek to intercept such communications for the first six months of this investigation." *Id.* at 4. The government argues that the defendants' theory "would yield an absurd result" because "it would require the

Government to adhere to the standards for interception of wire communications even where the Government seeks no such communications and lacks probable cause for such communications, simply because it is technically possible to intercept wire communications concurrently with electronic communications." *Id.*[8]  For the reasons explained below, the Court agrees with the government.

### 1.  Relevant Statutory Provisions

When first enacted, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510–2522, addressed only the interception of wire and oral communications, and barred admission at trial of such communications, plus "evidence derived therefrom . . . if disclosure of that information would be in violation of this chapter," 18 U.S.C. § 2515.  This law also authorized "[a]ny aggrieved person" to seek suppression of such communications, "or evidence derived therefrom," on the following three grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." *Id.* § 2518(10)(a).  Title III was amended in 1986, by the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub. L. No. 99-508, 100 Stat. 1848 (1986), to expand certain protections provided to wire and oral communications, to electronic communications, *see, e.g.*, 18 U.S.C. § 2511(1)(a),(c), (d) and (e) (penalizing unauthorized interception of wire, oral and electronic communications).[9]  The parties

---

[8]    The government also argues that "Agustin lacks standing to challenge the electronic interceptions evidence because he fails to meet the statutory criteria of an 'aggrieved party' under Title III."  Gov't's First Opp'n T. III Intercepts at 2, 13–17.  This standing argument need not be addressed as this motion is resolved on alternative grounds.

[9]    ECPA added a definition of "electronic communications" to mean "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include," *inter alia*, "any wire or oral communication."  18 U.S.C. § 2510(12).

agree that BBMs constitute "electronic communications" within the meaning of Title III. *See* Gov't's First Opp'n T. III Intercepts at 5 ("Electronic communications are non-voice communications made over a network in or affecting interstate commerce, which include communications sent by [BBM] text messages . . . ."); Defs.' Second Reply Mot. Suppress T. III Intercepts at 4; *see also United States v. Jones*, 451 F. Supp. 2d 71, 75 (D.D.C. 2006), *rev'd on other grounds*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd*, 132 S. Ct. 945 (2012)). While not altering the scope of the exclusion remedy, which continues to be limited to improper interception of wire and oral communications, *see* 18 U.S.C. § 2515, ECPA did amend other provisions of Title III to encompass "electronic communications."

In particular, as relevant to the instant suppression motion, Title III provides that an order "authorizing or approving the interception of any wire, oral, or electronic communication" must specify, *inter alia*, "the identity of the agency authorized to intercept the communications, and of the person authorizing the application." *Id.* § 2518(4)(d). The statute further dictates who qualifies as a "person authorizing the application": for wire and oral communications, "[t]he Attorney General, Deputy Attorney General, [and] Associate Attorney General," among other high-level DOJ officials, "may authorize an application," *id.* § 2516(1); and, for electronic communications, the amendments effected by ECPA provide that "*[a]ny attorney* for the Government (as such term is defined for purposes of the Federal Rules of Criminal Procedure) may authorize an application," *id.* § 2516(3) (emphasis added).

### 2. Analysis

The defendants argue that the wiretap orders at issue in this case are "insufficient on [their] face" for failing to identify the appropriate high-ranking DOJ official authorizing the interceptions. *See* Defs.' Mot. Suppress T. III Intercepts at 1, 4 (internal quotation marks and

citation omitted).  In advancing this argument, the defendants rely on *Scurry*, in which the D.C. Circuit held that "a [Title III] wiretap order is 'insufficient on its face,' 18 U.S.C. § 2518(10)(a)(ii), where it fails to identify the Justice Department official who approved the underlying application, as required by Title III, *id.* § 2518(4)(d)." *Scurry*, 821 F.3d at 5.  Given that the orders authorizing the wiretaps in *Scurry* did not specify the statutorily required high-ranking DOJ official who had signed off on the underlying application, the D.C. Circuit mandated that the information collected pursuant to the wiretaps at issue be suppressed.  *Id*.

At issue in *Scurry* were *wire* communications.[10]  By contrast, as noted, an order and application for interception of *electronic* communications may be authorized by "[a]ny attorney for the Government," as defined in the Federal Rules of Criminal Procedure.  18 U.S.C. § 2516(3).  In this case, the applications were signed by "Andrea Goldbarg, Assistant Deputy Chief in the United States Department of Justice," Initial T. III App. at 1, and the initial order authorizing the interceptions at issue indicated that the application for the order had been submitted by "Andrea Goldbarg, Assistant Deputy Chief in the United States Department of Justice," Initial T. III Order at 1.  The government maintains, and the defendants do not dispute, that Ms. Goldbarg is an attorney for the government, as contemplated by the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 1(b)(1) (defining "attorney for the government" in pertinent part as "the Attorney General or an authorized assistant"); Gov't's First Opp'n T. III

---

[10]    The D.C. Circuit did not expressly state that the intercepts at issue in *Scurry* involved wire communications, as opposed to electronic communications, but a review of the record indicates that the warrants issued authorized the relevant law enforcement authorities to intercept wire communications from the defendants' cell phones.  *See United States v. Savoy*, Crim. No. 10-310 (RCL) (D.D.C. 2012), ECF Nos. 59, 77, 90, 105, 108; *see also Scurry*, 821 F.3d at 6 (referring to a "wiretap on Scurry's cell phone" and "Scurry's tapped calls").  In addition, the D.C. Circuit's textual analysis addressed only wire and oral communications since the Court cited 18 U.S.C. § 2516(1), *Scurry*, 821 F.3d at 8, which governs "wire and oral communications," whereas a separate subsection of the same provision governs "electronic communications," *see* 18 U.S.C. § 2516(3).

11

Intercepts at 10.[11]  Thus, if the Title III orders at issue appropriately sought and were authorized to intercept electronic communications, they are not "insufficient on [their] face," 18 U.S.C. § 2518(10)(a)(ii), and the resultant interceptions are not subject to suppression.  This leads directly to the key issue raised by the defendants that, in light of the "hybrid" interceptions of BBMs and AMR files, the applications and orders issued in connection with the underlying investigation should have complied with the statutory requirements applicable to wire communications.

As noted, the defendants' evolved position, which relies heavily on legislative history, is that the government should have sought and obtained authorization to intercept both wire and electronic communications.  *See* Defs.' Fourth Reply Mot. Suppress T. III Intercepts at 8–10; Defs.' Third Reply Mot. Suppress T. III Intercepts at 1–2.  In particular, the defendants point to a House Judiciary Committee Report on ECPA, stating that: "The Committee understands that [DOJ] will apply for a court order under the 'wire' standards in cases where a tap may intercept

---

[11]     Confusingly, the initial application and order authorizing interception of the electronic communications on Target Device #1 uses language pertinent to oral and wire communications.  *See, e.g.,* Initial T. III App. ¶ 3 (stating that, "[p]ursuant to Title 18, United States Code, Section 2516, an appropriate official of the Criminal Division, United States Department of Justice, having been specially designated by the Attorney General pursuant to Order Number 3055-2009 dated February 26, 2009, has authorized this application."); Initial T. III Order at 4 (stating that, "pursuant to the application authorized by an appropriate official of the Criminal Division, United States Department of Justice, who has been specially designated by the Attorney General of the United States to exercise the power conferred on him by Title 18, United States Code, Section 2516 are authorized to intercept electronic communications . . . to and from TARGET DEVICE #1.").  Notwithstanding that both the application and order include language pertinent to authorizing wire and oral communications, since § 2516 does not require sign-off by a high-level DOJ official, this surplusage does not alter the validity of the order.  *See Scurry,* 821 F.3d at 8 ("To determine whether a wiretap order is facially insufficient, a reviewing court must examine the four corners of the order and establish whether, on its fact, *it contains all that Title III requires it to contain.*") (emphasis added); *id.* at 12 (noting that the D.C. Circuit's previous opinion in *United States v. Glover,* 736 F.3d 509, 515 (D.C. Cir. 2013), "left open the possibility that a 'technical defect' in a wiretap order might not rise to the level of facial insufficiency, but rather would render the order 'imperfect'").  As the government explains, "[t]he Title III application language . . . regarding the identification of the 'appropriate official' reflects DOJ policy to secure additional internal approval of applications for interception of electronic communications," but this is "DOJ policy and is not statutorily required."  Gov't's First Opp'n T. III Intercepts at 11 n.4 (citing U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL, § 9-7.100, https://www.justice.gov/usam/usam-9-7000-electronic-surveillance#9-7.100); *see also* Gov't's Third Opp'n T. III Intercepts at 16 (further explaining that, in April 2013, government "began including the name of the high-level DOJ official in the applications . . . based upon internal protocols and guidance of the Office of Enforcement Operations of the Department of Justice, not due to statutory requirements.").

mixed wire and electronic communications," and "[a]s long as the wire standards are followed a single court order should suffice to authorize the interception of both wire and electronic communications involving the same lines of instruments." *Id.* at 2 (quoting H.R. REP. NO. 99-647, at 35–36 (1986)).[12] This language is set in a paragraph acknowledging, given ECPA's new definition of "electronic communication," that "[a] transaction may consist, in parts, of both electronic communications and wire or oral communications," and that while "the transmission of data over the telephone is an electronic communication," parties' speaking "with one another between data transmissions," would be making a wire communication," and "a party's utterances into the telephone mouthpiece are an oral communication." H.R. REP. NO. 99-647, at 35. In context, the purpose of this language appears to be to urge use of the "wire" standard when the targeted "transaction" contains different types of communications, subject to differing rules of disclosure; hence the report goes on to instruct that where interception of the entire communication is sought, "a single court order should suffice to authorize the interception of both wire and electronic communications involving the same lines or instruments." *Id.* at 36.[13] This language simply begs the question at issue here of whether compliance with this "wire" standard is required when the "wire" parts of the communication are not part of the "transaction" targeted for interception.

---

[12]    The defendants also cite a handbook on surveillance prepared by the Internal Revenue Service ("IRS") Criminal Tax Division that focuses on the identical language of the House Judiciary Committee Report but expressly states that the handbook is "not intended to have the force of law" or "replace thorough research." *See* Defs.' Fourth Reply Mot. Suppress T. III Intercepts at 9; *id.*, Ex. 1, IRS CRIMINAL TAX DIVISION, SURVEILLANCE HANDBOOK at i, 39, ECF No. 129-1. Thus, this IRS handbook does little to advance the defendants' argument.

[13]    This somewhat opaque language in the House Judiciary Committee Report relied upon by the defendants is notably absent from the Senate Judiciary Committee's Report on ECPA, which report also makes a point of "recogniz[ing] that a transaction may consist, in part of both electronic communications and wire or oral communications" and that "different aspects of the same communication might be characterized differently." S. REP. NO. 99-541, at 16 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3570.

In short, this House Judiciary Committee Report language may bear on situations in which the government is actually seeking to capture both electronic and wire forms of communications, but this was not the government's intent here. The government only began collecting these AMR files in this case because of "a technological limitation." Gov't's' Second Suppl. Opp'n Defs.' Mot. Suppress T. III Intercepts ("Gov't's Third Opp'n T. III Intercepts") at 14, ECF No. 101-2. Indeed, as the government explains, BlackBerry was "unable to discern [whether] a particular BBM contain[ed] an embedded wire communication unless it manually reviewed the data for audio files, and concluded the audio files included the human voice," which BlackBerry declined to do. Gov't's Second Opp'n T. III Intercepts at 4; *see also* Status Conf. Hr'g (*rough*) Tr. (Aug. 17, 2017) at 70–79. As a result, BlackBerry "automatically" forwarded data, without separating the electronic from the wire communications, to the FBI Data Intercept Technology Unit ("DITU") server, which then "automatically forwarded the messages in this case to specialized equipment located at the FBI El Paso Division, where it was reviewed by the monitors." Gov't's Second Opp'n T. III Intercepts at 3. To address this technical challenge of disaggregating AMR files from the court-authorized electronic intercepts, the government took steps to ensure monitors minimized and did not listen to any unauthorized AMR and other audio files. *See* Gov't's Second Opp'n T. III Intercepts at 4; Jt. Stm. Discovery ¶ 5 (discussing verbal instructions and signage on minimization).[14]

The government contends that "simply because it is technically possible to intercept wire communications concurrently with electronic communications," law enforcement should not be required to seek authority to intercept both under the wire standard. Gov't's Fourth Opp'n T. III

---

[14]     According to the government, even though audio files without the human voice would constitute electronic communications under Title III, "in an abundance of caution," the government "instructs monitors not to listen or retain any audio files when it does not have authority to intercept wire communications in addition to electronic communications." Gov't's Second Opp'n T. III Intercepts 4 n.1.

Intercepts at 4.  The perverse result of such a requirement would be that some communication technologies might be put outside the reach altogether of Title III surveillance or, alternatively, more intrusive surveillance may ensue.  For example, if the government seeks, and only has probable cause sufficient, to intercept electronic communications, but due to the unique technology involved, the targeted electronic communications are transmitted simultaneously with wire communications, the government would be unable to obtain court authorization for the interception, at least or until, sufficient probable cause were developed to meet the standard for wire communication interceptions as well.  Likewise, where the government may be able to establish probable cause to intercept wire communications, but only wants to obtain electronic communications, the government would have to seek authority for a hybrid wiretap, leading to more expansive surveillance, with concomitant privacy intrusions for the targets of the surveillance and the increased burden on the government to manage surveillance of multiple communication formats.  This simply makes no sense as a policy matter, and is not required by the wiretap statute, which instead expressly contemplates using minimization procedures to address the capture of unauthorized communications, either in terms of format or content.  18 U.S.C. § 2518 (instructing that "[e]very order and extension thereof . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter").

The Court concludes that the government took appropriate steps to minimize wire communications, which were intercepted due to the technology subject to surveillance, and that the Title III applications and orders at issue are facially valid since they sought only the

interception of electronic communications and, consequently, reflect the appropriate authorizing

government attorney's approval.[15]

The final issue raised by the defendants is whether the interception of seven AMR files,

which the government concedes are wire communications and therefore were improperly marked

"pertinent," requires suppression of the entire wiretap.  *See* Defs.' Second Reply Mot. Suppress

T. III Intercepts at 2; Gov't's Fourth Opp'n T. III Intercepts 4–5.  As noted, the government

reports that approximately 170 AMR files were intercepted, 163 of which were minimized and

seven of which were "erroneously marked pertinent."  Gov't's Second Opp'n T. III Intercepts at

4.  The monitors were instructed "not to open or listen to an AMR files because they did not have

authorization to intercept wire communications."  *Id.*  According to the government, the seven

AMR files marked pertinent "were all received within the same [monitoring] session by the same

monitor."  *Id.* at 5.  "Based upon discussions with law enforcement agents, the monitor who

marked the seven (7) AMR files as pertinent did not listen to the audio contained within them."

*Id.* at 4–5.  This was confirmed by a "firewall agent," who "reviewed the transcripts and

summaries of the electronic communications that contained the AMR files in order to determine

if the AMR files were transcribed or summarized."  *Id.* at 5.  Thus, the AMR files appear to have

---

[15]    In any event, even the defendants were able to show some statutory violation, which they have not, suppression of the intercepted BBM communications is not available here.  As noted, the ECPA amendments to Title III did not add "electronic communications" to either § 2515 (directing that "no part of the contents" of "any wire or oral communication" may be introduced at trial "if the disclosure of that information would be in violation of this chapter") or § 2518(10)(a) (authorizing motion by "aggrieved person . . . to suppress the contents of any *wire or oral communication* intercepted pursuant to this chapter" if, *inter alia*, the order authorizing the interception of such communications is "insufficient on its face") (emphasis added).  Thus, ECPA "does not apply the statutory exclusionary rule contained in title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the interception of electronic communications."  S. REP. No. 99-541 at 23 (1986); *see also United States v. Reed*, 575 F.3d 900, 915 (9th Cir. 2009) (finding that "the failure to seal [electronic communications] would not require suppression" because "[s]uppression for violation of the statute is permitted only for 'wire or oral communications.'"); *United States v. Steiger*, 318 F.3d 1039, 1050–51 (11th Cir. 2003) (finding that electronic communications are not subject to suppression for a non-constitutional violation under Title III); *United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990) ("The ECPA does not provide an independent statutory remedy of suppression for interceptions of electronic communications.").

been "marked pertinent due to human error by a monitor, and otherwise handled in the same manner as other communications marked non-pertinent and minimized." *Id.* Consequently, "[t]he Government has not listened to these files and has not relied upon them in any way during its investigation." *Id.*

The statutory requirement that government surveillance of communications "minimize the interception of communications not otherwise subject to interception under this chapter," 18 U.S.C. § 2518(5), does not create an "inflexible rule of law." *Scott v. United States*, 436 U.S. 128, 139 (1978). Rather the requirement demands an evaluation of the "facts and circumstances of each case." *Id.* at 140. In this case, the government took reasonable efforts, given the technical obstacles to avoiding collection of AMR files during court-authorized interception of electronic communications, to minimize the wire communications. Indeed, the only alternative suggested by the defendants is for the government to have sought and obtained additional authority to expand the surveillance to encompass all wire communications, *see* Defs.' Second Reply Mot. Suppress T. III Intercepts at 3, which is no solution at all to the minimization challenge.

The proper remedy here is to suppress only those seven AMR files erroneously marked pertinent, similar to situations in which partial suppression is ordered when the government has failed to minimize certain intercepted communications properly. Gov't's Fourth Opp'n T. III Intercepts at 5 (citing *Suggs*, 531 F. Supp. 2d at 24). In *Suggs*, the court explained that "[t]otal suppression 'is not appropriate unless the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief . . . and is reserved for the particularly horrendous case . . . where the government has made effectively no effort towards minimization whatsoever.'" 531 F. Supp. 2d at 24 (internal quotation marks and citations

omitted).  Suppressing all the BBM interceptions in this case due to the interception of AMR files would not be appropriate where, as here, the AMR files were transmitted with, and inseparable from, the lawfully intercepted electronic communications and were effectively minimized.

Accordingly, the defendants' motion to suppress the entire Title III intercept is **DENIED** and only the seven AMR files erroneously marked pertinent must be suppressed.[16]

### B.  Defendants' Motion to Compel Discovery

Both defendants have moved, pursuant to Federal Rule of Criminal Procedure 16, to compel discovery of material related to the Title III wiretaps.  *See generally* Agustin's Discovery Mot.; Panfilo's Discovery Mot.; Panfilo's Am. Discovery Mot.  Specifically, the defendants seek to compel the government's production of two groups of intercepted communications: (1) "[m]inimized interceptions of Defendant Panfilo" ("Panfilo's minimized intercepts"); and (2) "[a]ll interceptions from the Title III investigation, from all target devices, including pertinent and minimized communications," and including intercepts between alleged co-conspirators ("co-conspirator intercepts").  Jt. Stm. Discovery ¶ 7; *see also* Panfilo's Reply Gov't's Opp'n Defs.' Mots. Compel ("Panfilo's Reply Discovery Mot.") at 3, ECF No. 58.  The government has already produced to the defendants the intercepts from the BlackBerry devices used by Panfilo and the underlying applications and orders for those intercepts, as well as the "applications, affidavits, and orders related to the interception of target devices utilized by individuals other than Defendant Panfilo," Gov't's Opp'n Defs.' Discovery Mots. at 3–4, but not any minimized

---

[16]     The defendants appear to dispute that human error caused the erroneous non-minimization of seven AMR files and, for this reason, seek disclosure of all the minimized intercepts to confirm the government's explanation. *See* Jt. Stm. Discovery ¶ 7.  This discovery request is discussed *infra* in Part I.B.

communications or pertinent intercepted communications of only co-conspirators, Panfilo's

Reply Discovery Mot. at 2–3.[17]

The defendants seek both Panfilo's minimized intercepts and co-conspirator intercepts in

order to "argue that the Government improperly minimized the communications . . . and search

for exculpatory information." Jt. Stm. Discovery ¶ 7.[18] Obviously, if the defendants succeeded

in this request, they would be buried in massive discovery from the intercepted communications

of almost sixty devices for almost two years, the vast majority of which discovery would not be

used against them at trial, and the government would have the burdensome task of preparing all

of these materials for production. The government declines to produce these materials because:

"1) the Government does not intend to rely upon them in their case in chief; 2) the Defendants

are not entitled to these materials; and 3) the Defendant's proposed use of the minimized

communications to argue that the Government improperly minimized the communications is not

the appropriate method, as established by the case law, to challenge the Government's

minimization of the intercepts." *Id.* Moreover, the government contends, "Defendants are not

entitled to an 'open file' search of the Government's evidence." *Id.*[19] The government is

correct.

---

[17]    Despite initially refusing, the government ultimately produced these materials to Agustin. *See* Gov't's
Resp. Suggestion of Court Regarding Discovery ("Gov't's Resp. Discovery") at 1, ECF No. 80. The government
has also produced, pursuant to the defendants' initial motions to compel: (1) to both defendants, minimization
documents, including minimization instructions in Government counsel's possession, *see* Gov't's Opp'n Defs.'
Discovery Mots. at 5 (distinguishing "minimization documents" from "minimized intercepts"); Jt. Stm. Discovery ¶
5; Gov't's Resp. Discovery at 1, and (2) to Panfilo, "the [California] state-authorized pertinent intercepts," which the
government only discovered around the time of filing its original opposition to the motions to compel, *see* Gov't's
Opp'n Defs.' Discovery Mots. at 5; *see also* Agustin's Reply Mem. Supp. Discovery Mot. ("Agustin's Reply Supp.
Discovery Mot.") at 1 n.1, ECF No. 57.
[18]    The defendants also seek this discovery to "independently determine when audio files were first
intercepted," Jt. Stm. Discovery ¶ 7, but this reason seems particularly weak. The government has already conceded
that the first wire intercept occurred on March 23 2013, just over a month after the wiretap surveillance began, *id.* at
¶ 6, and "independent" verification of this, or an even earlier, date of minimized communications is entirely
immaterial.
[19]    As with Agustin's motion to suppress the wiretaps, the government challenges Agustin's discovery motion
on standing grounds, reasoning that "[b]ecause Defendant Agustin lacks standing to challenge the Title III electronic

## 1.    *Relevant Legal Standard*

"Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution to turn over to the defense evidence material to the charges at issue." *Yates v. United States*, 135 S. Ct. 1074, 1083 (2015). Specifically, five types of evidence must be turned over: (1) the defendant's oral, written, or recorded statements, Fed. R. Crim. P. 16(a)(1)(A)–(B); (2) the defendant's prior criminal record, Fed. R. Crim. P. 16(a)(1)(D); (3) certain documents and objects, "if the item is within the government's possession, custody, or control," Fed. R. Crim. P. 16(a)(1)(E); (4) the results or reports of any physical or mental examination, test, or experiment, Fed. R. Crim. P. 16(a)(1)(F); and (5) a written summary of any expert testimony that the government intends to use during its case-in-chief at trial, Fed. R. Crim. P. 16(a)(1)(G). The defendants' instant motions to compel hinge on the third category of evidence. *See* Fed. R. Crim. P. 16(a)(1)(E).[20]

_____

interceptions, he has failed to show that the pertinent intercepts and corresponding Title III documents are material to his defense." Gov't's Opp'n Defs.' Discovery Mots. at 7–8. Agustin counters that "[t]he issue of this defendant's 'standing' to challenge the wiretap is . . . irrelevant to the question of whether the materials should be produced under Rule 16." Agustin's Reply Supp. Discovery Mot at 4. Since this motion is resolved on alternative grounds, the government's standing argument need not be addressed. *See supra* note 8.

[20]    In his latest filing on this issue, Panfilo argues that "the minimized communications" are "relevant under Rule 16(a)(1)(B)[i] [sic] as statements of the Defendant, his role in the alleged conspiracy, and must be reviewed by the defense to aid in determining if the Government fulfilled its minimization requirements." Panfilo's Reply Discovery Mot. at 3 (citing Fed. R. Crim. P. 16(a)(1)(B)(i)). "Rule 16's provision for the discovery of oral statements is intended, in part, to 'facilitate the raising of objections to admissibility prior to trial,'" which "contributes to the efficient administration of justice," protects "the defendant's right to a fair trial," and "prevents unfair surprise." *United States v. McElroy*, 697 F.2d 459, 463–64 (2d Cir. 1982) (quoting Fed. R. Crim. P. 16 advisory committee's note to the 1974 amendments); *see also United States v. Smith*, Crim. No. 16-91-01-JL, 2017 U.S. Dist. LEXIS 201062, at *19–20 (D.N.H. Oct. 18, 2017) ("Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.") (internal quotation marks and citation omitted). Since minimized intercepted communications, by definition, are not going to be used by the government in its case-in-chief or at all, a defendant has no need for disclosure of such material in order to raise any admissibility challenge. Moreover, to the extent a defendant seeks disclosure of such minimized intercepted communications as somehow exculpatory, this argument fails. *See U.S. v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."). For these reasons, minimized communications are not automatically "relevant" within the meaning of Rule 16(a)(1)(B)(i), and absent any such

Under Rule 16(a)(1)(E), "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and," *inter alia*, "the item is material to preparing the defense" or "the government intends to use the item in its case-in-chief at trial." FED. R. CRIM. P. 16(a)(1)(E)(i)–(ii); *see United States v. Thompson*, 562 F.3d 387, 396 (D.C. Cir. 2009). Here, the government intends to use Panfilo's electronic communications in its case-in-chief "as direct evidence against Defendant Panfilo and as statements made in furtherance of the conspiracy against Defendant Agustin," Gov't's Opp'n Defs.' Discovery Mots. at 3–4, but the government does not plan to rely on any electronic communications not involving Panfilo in its case-in-chief, *id.* at 4–5; Jt. Stm. Discovery ¶ 7. Thus, to be entitled, under Rule 16(a)(1)(E), to Panfilo's minimized intercepts and/or co-conspirator intercepts, the defendants must show that these communications are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). "[I]n the context of Rule 16, 'the defendant's defense' means the defendant's response to the Government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996). To qualify as "material for preparing the defense," the D.C. Circuit has explained that the discovery sought must be related "to refutation of the government's case in chief," and not "to establishment of an independent . . . bar to the prosecution." *United States v. Rashed,* 234 F.3d 1280, 1285 (D.C. Cir. 2000); *see also United States v. Marshall*, 132 F.3d 63, 67 n.1 (D.C. Cir. 1998) ("The Supreme Court recently clarified the meaning of the phrase 'material to the preparation of the defendant's defense.' The phrase 'authorizes defendants to examine government documents

---

showing of relevance, Panfilo is not entitled to compel disclosure of any oral statements captured in minimized AMR files.

21

material to the preparation of their defense against the Government's case-in-chief . . . .'") (quoting *Armstrong*, 517 U.S. at 463).

In other word, "the evidence must not simply bear some abstract relationship to the issues in the case, . . . and the government must disclose Rule 16 evidence only if such evidence enables the defendant significantly to alter the quantum of proof in his favor." *United States v. Libby*, 429 F. Supp. 2d 1, 7 (D.D.C. 2006) (internal quotation marks and citation omitted). Rule 16(a)(1)(E) applies equally to exculpatory and inculpatory evidence, since "it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths." *Marshall*, 132 F.3d at 67.

As a general matter, "Rule 16 establishes 'the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases.'" *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003) (quoting FED. R. CRIM. P. 16 advisory committee's note to the 1974 amendments). That being said, "Rule 16 does not authorize a blanket request to see the prosecution's file." *United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)).

### 2. Analysis

The defendants fail to demonstrate that the minimized Panfilo intercepts and co-conspirator intercepts are "material" to preparing their defenses in "response to the Government's case in chief." *Armstrong*, 517 U.S. at 462. To the contrary, the two reasons the defendants have put forward to compel this discovery—the possibility of finding some exculpatory information and to verify the government's minimization procedures—fall far short of justifying the massive discovery undertaking contemplated by this request. They are simply

not entitled to the broad, time-consuming and burdensome fishing expedition encompassed by this discovery demand. *Cf. United States v. George*, 786 F. Supp. 11, 14 (D.D.C. 1991) ("At least one of the rationales behind the materiality requirement (and limiting discovery by criminal defendants generally) is to insure that the government not expend excessive time and effort securing documents for the defendant.").

First, the defendants' vague asserted need for potentially exculpatory evidence that might be contained in the minimized and co-conspirator intercepts does not pass muster. *See United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996) (rejecting, in the *Brady* context, "bare speculation [of] . . . the existence of favorable materials"); *United States v. Sims*, 508 Fed. App'x 452, 460–61 (6th Cir. 2012) (denying a Rule 16(a)(1)(E) motion to compel discovery because the defendant's motion was predicated on "a series of generalities based upon an unsubstantiated possibility") (internal quotation marks omitted). With respect to the alleged co-conspirators' intercepts, Panfilo suggests that "if the Defendant is not the subject of nor any of his communications captured in any of the intercepts of his co-conspirators, these communications have apparent exculpatory value." Panfilo's Reply Discovery Mot. at 3. As noted, *supra* note 20, Panfilo's absence from certain pertinent intercepts of co-conspirators does little to rebut the inculpatory evidence contained in the approximately 12,500 Panfilo intercepts the government seeks to use at trial. *See U.S. v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."). Moreover, far easier methods to establish the fact that Panfilo is not a party to the requested co-conspirator intercepts are available than wholesale production of those intercepts. A straight-forward question to an appropriate law enforcement agent or a

stipulation with the government regarding the fact that the government has identified intercepts as containing communications of co-conspirators, and not Panfilo, come to mind.

Agustin has provided a similarly vague rationale for seeking the minimized and co-conspirator intercepts: "The defense must have access to all the intercepts in order to analyze their contents and determine what evidence exists that both potentially inculpates or exculpates him of the charges in this case." Agustin's Discovery Mot. at 4. As a threshold matter, the government has stated that the undisclosed intercepts will not be introduced in the government's case-in-chief, and, accordingly, the inculpatory nature of any of these communications is not material. Moreover, Agustin has provided absolutely no information about why communications to which he was not a party because he was incarcerated would contain any exculpatory information about him. The defendants' mere desire to "search" the intercepts "for exculpatory information," Jt. Stm. Discovery ¶ 7, reveals this request as the fishing expedition it is.

In contrast to the defendants' speculative reasons proffered here, in other cases in which a defendant has made a Rule 16(a)(1)(E) motion to compel discovery based on its potential exculpatory value, the defendant clearly identified how the evidence would further the defense. *See, e.g.*, *United States v. O'Keefe*, Crim. No. 06-249 (PLF), 2007 U.S. Dist. LEXIS 31053, *2, 11 (D.D.C. Apr. 27, 2007) (granting a motion to compel in a corruption case where the evidence sought would prove that there was "no 'official act' as a matter of law and that the defendants did not have the requisite criminal intent as a matter of fact"); *Libby*, 429 F. Supp. at 14–17 (granting in part the defendant's motion to compel and ordering disclosure of the topics covered during briefings to aid the defendant in his defense that he was preoccupied during the relevant time period); *Karake*, 281 F. Supp. 2d at 308 (granting the defendants' motion to compel discovery where the information sought was "crucial to their ability to file motions to suppress

[their] statements . . . , and may reveal mitigating evidence arising from the circumstances of their extradition").

In any event, the government represents that it is "unaware of any exculpatory material regarding the Defendants in this case" and affirms that it has and will continue to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and *Weatherford v. Bursey*, 429 U.S. 545 (1977). Gov't Opp'n Defs.' Discovery Mots. at 9. The government reiterated this point during the August 2, 2017 hearing and added that the members of the Meza Flores DTO (the distribution cell of a larger Mexican drug trafficking organization at issue in this case) used many different modes of communication. *See* Status Conf. Hr'g (*rough*) Tr. (Aug. 2, 2017) at 38–39. Thus, even if Panfilo were not a participant in all of the intercepted Blackberry messages among DTO members, this would not necessarily be exculpatory. Based on the government's written and oral assurances, the Court is satisfied that the government has been and will remain "vigilant in ensuring that it fulfills its discovery and *Brady/Giglio* obligations." *Karake*, 281 F. Supp. 2d at 306 (accepting the government's assertion that it was aware of "no *Brady* information of the type described").

The next reason given by the defendants for compelling discovery of the minimized Panfilo and co-conspirator intercepts shows plainly that this discovery demand is not intended to prepare a defense in response to the government's case-in-chief. The defendants argue that receiving *all* intercepts, including those of alleged co-conspirators and minimized, will help show that the government improperly minimized the communications. *See* Jt. Stm. Discovery ¶ 7. Although the erroneous marking of seven AMR files as "pertinent" rightfully raises some concern, seven is a "small number" compared to the approximately 12,500 electronic communications marked pertinent and not minimized. Gov't Third Opp'n T. III Intercepts at

18.  In addition, given the detailed description provided by the government of the minimization procedures employed, and the fact that the seven AMR files were all received in the same session by the same monitor and have no accompanying transcript, Gov't's Second Opp'n T. III Intercepts at 5, the defendants' argument that additional minimization violations may be uncovered through the requested compelled discovery is purely speculative.

This defense effort to find additional evidence to bolster arguments challenging the minimization procedures used during the wiretap phase of the investigation does not refute any of the government's direct evidence against the defendants.  To the contrary, even if additional minimization violations were found, the wiretap statute does not provide a suppression remedy for Panfilo's intercepted electronic communications, which could still be used in the government's case-in-chief.  Consequently, the defendants' wishful thinking of finding additional minimization violations does not justify the requested discovery under Rule 16.  *See, e.g.*, *United States v. Pray*, 734 F. Supp. 2d 158, 159–60 (D.D.C. 2010) (denying defendants' motion to compel discovery of periodic wiretap reports for use in challenging, *inter alia*, minimization and propriety of government's procedures since such evidence "do[es] not constitute material evidence");  *United States v. Trabelsi*, Crim. No. 06-89 (RWR), 2015 U.S. Dist. LEXIS 189343, *6–7 (D.D.C. May 8, 2015) (finding that defendant's request for discovery to was "not warranted under Rule 16(a)(1)(E)(i)" since it is "not to rebut the government's case in chief but to support an independent argument to dismiss the indictment").

Accordingly, the defendants' motions to compel discovery are **DENIED**.

## II.  GOVERNMENT'S MOTION TO RECONSIDER USE OF NON-LITERAL TRANSLATIONS OF INTERCEPTED COMMUNICATIONS TRANSCRIPTS

The government has moved to use at trial transcripts of intercepted BlackBerry Messenger communications ("BBMs") in the form produced to the defendants on August 8,

2017.  Gov't's BBMT Mot. at 1 & n.1.  Shortly after initial production of the transcripts at issue, the defendants raised concern at a status conference held on August 11, 2017, that the government's proposed transcripts did not provide literal translations of certain words but instead interpreted Spanish slang to have potentially prejudicial meaning, like "cocaine" for a word literally translated as "parakeet."  Status Conf. Hr'g (*rough*) Tr. (Aug. 11, 2017) at 4–5.[21]

Conceding that literal translations are not used for certain Spanish words in these proposed transcripts, the government argues that the transcripts reflect "English translations of Spanish slang words or colloquialisms that are acceptable translations of the Spanish language BBM communications," based upon the "knowledge and experience" of the translator.  Gov't's BBMT Mot. at 2.  According to the government, if literal translations are used, the translator "would be unable to testify that the translation is a fair and accurate translation of the Spanish communication based upon her expertise and based on the context of the conversation," since interpreting the import of the communication requires more than "taking statements in one language and expressing them in a different language" but instead reflects "a continuing exercise of judgment and analysis of what is meant or intended to be said by the parties."  *Id*. at 6–7 (internal quotation marks and citation omitted).

Specifically, the government has enumerated eleven words set out in the chart below that have been translated differently from the literal meaning to reflect the common slang understanding.  *See id.*[22]

---

[21]     The government was directed to provide the Defendants with "literal" translations of the intercepted BBM communications by August 15, 2017, *see* Minute Order (Aug. 11, 2017) (directing government "to re-produce to the defendants, by August 15, 2017, transcripts for Blackberry intercepts, containing *literal* translations of all words"), and the government generally complied by providing "updated" transcripts.  In the instant motion, the government seeks to use the original transcripts produced on August 8, 2017.

[22]     The defendants mentioned the word "*perico*" as an example of an inaccurately translated word, Status Conf. Hr'g (*rough*) Tr. (Aug. 11, 2017) at 4, but the government indicates this word may be literally translated at "cocaine," Gov't's BBMT Mot. at 1 n.1 (noting that the REAL ACADEMIA ESPAÑOLA ("RAE"), a recognized Spanish

| | Intercepted Spanish Word | Literal Translation | Slang Translation Used in Proposed BBM Transcripts |
|---|---|---|---|
| 1 | *Simón* | Simon | yes |
| 2 | *Sale* | leave | alright |
| 3 | *Jale* | pull | work, job, stuff |
| 4 | *Fierro* | iron | guns; also interjection like "Alright" or "go for it!" |
| 5 | *Paro* | Stop; strike; stoppage | "hacerme el paro" is to do me a favor |
| 6 | *Chale* | chalet | No way!; Oh my God!; sure |
| 7 | *Aguitarse* | *(no definition)* | bummed; bummed out |
| 8 | *Parrque* | park | ammunition; ammo |
| 9 | *Morros* | snout/nose | kid; boy |
| 10 | *Pedo* | fart | *no hay pedo*; there's no problem |
| 11 | *Vato* | *(no definition)* | dude |

Here, without identifying any of the eleven words or other particular words or phrases used in the proposed transcripts as disputed, the defendants have generally challenged the transcripts' accuracy and requested "a pre-trial hearing to determine the admissibility of the materials." Defs.' Opp'n Gov't's BBMT Mot. at 1, ECF No. 100.[23] The government's translator, Judi O'Brien, has "approximately 20 years of experience as a Spanish language translator and interpreter," an advanced Master of Arts degree in Spanish and Latin American Studies from American University, and has, for the past seven years, "been employed as a translator and language services coordinator with the Narcotic and Dangerous Drug Section, U.S.

---

dictionary, lists "cocaine" as an acceptable definition of the word "*perico*"). The defendants do not contest this assertion in their opposition. *See generally* Defs.' Opp'n Gov't's BBMT Mot., ECF No. 100.

[23] The defendants initially contended that insufficient information was provided about the qualifications of the government's translator "to determine if she even has the expertise to translate the materials," citing the lack of any "expert notice pursuant to Federal Rule of Criminal Procedure 702 for the witness," or "information concerning the qualifications and methodology used to create the English language transcripts," or "what materials the translator was provided in this case." Defs.' Opp'n Gov't's BBMT Mot. at 1–3. Less than one week after the defendants pointed out the lack of a government expert notice for the translator of the proposed BBM transcripts, the government filed such a notice for Judi O'Brien, who is a certified Spanish to English translator. *See* Gov't's Not. Expert Testimony of Judi O'Brien at 1–2, ECF No. 106.

Department of Justice." Gov't Not. Expert Testimony of Judi O'Brien at 1–2, ECF No. 106.[24]

Despite these qualifications, the defendants question the translator's "proficiency" in interpreting "the dialect of Mexican Spanish that will be at issue in this case," since her "Spanish language education took place in Costa Rica." Defs.' Resp. Gov't. Not. Intent to Call Expert Witnesses ("Defs.' Resp. Gov't. Not. Expert Witnesses") at 2, ECF No. 123. The defendants, however, "will not object to the Government proceeding at their own peril with the use of Ms. O'Brien as their expert," and are trying to locate their own qualified expert "to review the tapes and blackberry messages and will provide the Government with the results of any forthcoming analysis as soon as it is prepared." *Id*. at 3; *see* Gov't's Reply Further Supp. Not. Intent to Call Expert Witnesses at 2, ECF No. 125 (noting that "the Defendants' [sic] do not challenge the sufficiency of the notices regarding Judi O'Brien").

To the extent the defendants challenge the interpretation reflected in the transcripts, the government contends that they may do so "*through cross-examination* or by the presentation of another qualified translator with a contrary view." Gov't's BBMT Mot. at 3 (citing *United States v. Verdin-Garcia*, 516 F.3d 884, 892–93 (10th Cir. 2008) (emphasis in original); *id*. at 3–5 (discussing *United States v. Khan,* 794 F.3d 1288, 1294–97 (11th Cir. 2015) (affirming ruling admitting non-literal transcripts at trial, noting that "[d]efendants who object to the manner in which a translator has performed the difficult and delicate task of moving meaning between two languages have a number of tools at their disposal—Rule 702, cross-examination, and limiting instructions, to name a few")). The government is correct.

---

[24] Ms. O'Brien has also provided testimony in three other trials in this court, Gov't Not. Expert Testimony of Judi O'Brien at 2, though without being qualified as an expert, Defs.' Resp. Gov't. Not. Intent to Call Expert Witnesses ("Defs.' Resp. Gov't. Not. Expert Witnesses") at 3, ECF No. 123.

Although "[t]he ideal procedure for testing accuracy is to have the prosecution and defense attorneys stipulate to a transcript," *United States v. Slade*, 627 F.2d 293, 302 (D.C. Cir. 1980), the D.C. Circuit has provided guidance as to the appropriate procedures when, as here, the accuracy of transcripts is disputed. In this circumstance, "the trial court can make a pretrial determination of accuracy after comparing the proposed transcript against the tapes or provide the jury with one transcript reflecting the prosecution's interpretation of the recording and one version reflecting the defendant's interpretation," *United States v. Holton*, 116 F.3d 1536, 1541 (D.C. Cir 1997); *see also Slade*, 627 F. 2d at 303 ("A third alternative is to present the jury with two transcripts, containing both sides' versions, and let the jury determine which is more accurate," in which "situation, because no one transcript is presented as 'correct,' the judge need not necessarily listen to the tapes or pass on the accuracy of any transcript.") (internal quotation marks and citation omitted). If two competing versions of the same recording are presented, the jury "should be instructed that there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept. The jurors also should be instructed that they should disregard any portion of the transcript or transcripts that they think differs from what they hear on the tape recording." *Holton*, 116 F.3d at 1543. If only the government submits a transcript, then cautionary instructions should be given that "the transcript is only one party's version," *United States v. Law*, 528 F.3d 888, 901–02 (D.C. Cir. 2008) (quoting *Holton*, 116 F.3d at 1542).

The precise procedure to be used at trial remains unclear due to the defendants' expressed need to locate their own qualified expert interpreter. Defs.' Resp. Gov't's Not. Expert Witnesses at 3. The defendants have now had since August 8, 2017, or over four months, to do so, as well as to determine precisely which interpretations in the proposed transcripts are disputed and to

prepare versions of their own transcripts, as necessary. Thus, the parties are required to submit jointly, by **January 10, 2018,** before the pretrial conference, a notice (1) detailing any outstanding disputes regarding the proposed transcripts produced on August 8, 2017; (2) whether any defendant intends to offer alternative transcripts; (3) if any defendant intends to offer alternative interpretations of the recordings, whether the parties intend to introduce one transcript containing both versions of the disputed portions of the recording or two separate transcripts; (4) the text of any requested cautionary instructions regarding the transcripts; and (5) any objection to permitting the jury to use the transcripts during deliberations. *See United States v. Edwards*, 887 F. Supp. 2d 63, 71–73 (D.D.C. 2012).

In view of the defendants' withdrawal of their objection to the government's translator's qualifications, their request for a pretrial hearing to evaluate and hear expert testimony about the proposed August 8, 2017 BBM transcripts is **DENIED**. Further, based upon the qualifications of the government's translator, whose expertise and methodology used to prepare the English transcripts at issue will be subject to cross examination at trial, the government's motion to use at trial the version of transcripts of intercepted BBMs produced on August 8, 2017, is **GRANTED**.

## III.    **DEFENDANT AGUSTIN'S MOTION TO INSPECT GRAND JURY MINUTES**

Both defendants previously unsuccessfully moved to dismiss Count Two of the Indictment charging a firearm offense, in violation of 18 U.S.C. § 924(c), as not applying extraterritorially and for being facially defective. *See Apodaca II*, 2017 U.S. Dist. LEXIS 131617, at *66 (denying defendants' motions to dismiss Count Two and finding that "§ 924(c) also applies extraterritorially" and "adequately informs the defendants of the § 924(c) offenses with which they are charged"). Undeterred, Agustin now raises a new challenge to Count Two and moves for "an *in camera* inspection of the grand jury minutes to determine what specific

evidence was presented concerning the possession of a firearm charged in Count Two of the Indictment," and what "legal instructions" were "provided to the grand jurors concerning Count Two's 'aiding and abetting' theory." Def.'s Mot. GJ Inspection at 1.[25] In particular, Agustin suspects that, first, the government's trial evidence may "constructively amend the Indictment," and, second, the grand jury was not properly instructed about "controlling law" requiring "that an aider and abettor had 'actual knowledge' that a firearm would be used in the commission of the offense," and failure to provide such instruction "would undermine the validity of the Indictment. *Id*. (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). The government objects, contending that this defendant "has not met his burden to overcome the presumption of regularity surrounding grand jury proceedings." Gov't Opp'n Def.'s Mot. *In Camera* Inspection of Grand Jury Minutes ("Gov't Opp'n Def.'s Mot. GJ Inspection") at 1, ECF No. 131. As explained below, the Court agrees with the government.

In evaluating this motion, the charge itself and the government's proffered evidence are first reviewed, before turning to analysis of whether either of Agustin's arguments warrant inspection of the grand jury minutes. Count Two charges, in relevant part, that the defendant, "[f]rom in or about July 2010, and continuing thereafter, up to and including May 2012, . . . did knowingly and intentionally use, carry, and brandish a firearm, during and in relation to one or more drug trafficking crimes, to wit: the crimes charged in Count One, and . . . possess a firearm in furtherance of such drug trafficking crimes." Agustin's Indictment, *United States v. Agustin Flores Apodaca*, Crim. No. 12-116 (BAH) at 1–3 (D.D.C. May 2, 2012), ECF No. 1. The

---

[25]     The defendant states that the belated filing of this motion on November 6, 2017, when the scheduling order required substantive motions to be filed by June 28, 2017, Min. Order (dated Mar. 3, 2017) is because the grounds for the motion did not become "apparent to defense counsel until the Government filed its Supplemental Notices concerning other crimes evidence and the Court resolved the originally filed legal motions." Def.'s Mot. GJ Inspection at 1.

government has proffered as evidence for this charge that: (1) cooperating witnesses will testify about Agustin's possession of firearms in the course of the drug trafficking activities charged in Count One of the Indictment; (2) in about December 2009, in El Burrion in Sinaloa, Mexico, Agustin carried firearms during a violent shoot-out; (3) in September 2010, Agustin attempted to trade drugs for .50 caliber machine guns for use against a rival drug cartel; and (4) in October 2013, in Santa Maria del Oro in the state of Nayarit, Mexico, co-defendant Panfilo and co-conspirators possessed weapons while fleeing from, and being involved in a shoot-out with, Mexican Marines. *Apodaca II*, 2017 U.S. Dist. LEXIS 131617, at *65.

**A. Requested Inspection of Evidence Presented To Grand Jury**

With respect to the first proffered basis for inspection of the grand jury minutes, Agustin denies that he is challenging "the sufficiency of the evidence presented to the grand jury," Def.'s Mot. GJ Inspection at 5; *see* Def.'s Reply Supp. Mot. *In Camera* Inspection of Grand Jury Minutes ("Def.'s Reply Mot. GJ Inspection") at 1, ECF No. 132, but requests only that the Court inspect "**what evidence** was presented . . . and take appropriate steps to ensure that the charge is not constructively amended at trial . . . ," Def.'s Mot. GJ Inspection at 5 (emphasis in original). He points out that: the last three alleged events do not support Count Two, since the December, 2009 evidence falls outside the two-year date range of the firearms charge; the September 2010 evidence amounts to an attempt, which is "a theory that is not included in the Indictment"; and the October 2013 evidence occurred after the Indictment had been returned on May 2, 2012. *Id.* at 4–5. Agustin concedes that more generalized testimony from cooperating witnesses about his possession of firearms in the course of drug trafficking activities would be sufficient to support the charge, but nonetheless urges inspection of the grand jury minutes apparently to ensure that such generalized evidence was, in fact, provided and to assess whether some undefined

"appropriate steps" must be taken to avoid constructive amendment of the indictment at trial, with the concomitant risk "of infecting the trial with reversible error," *id*. at 5, by "supplement[ing] the factual basis of criminal liability at the trial," Def.'s Reply Mot. GJ Inspection at 2.

At the outset, the government's response lacks any specific assurances about the evidence presented to the grand jury to support Count Two. *Id*. at 1 (noting that "Government has [not] even offered an informal 'proffer' as to the evidentiary predicate for Count Two presented to the grand jury"). Nevertheless, as Agustin concedes, the government had cooperating witnesses' testimony available in some form to present to the grand jury, and such evidence would be sufficient to support Count Two. Thus, despite his denial that he is challenging the sufficiency of the grand jury evidence, Agustin's request for *in camera* review of grand jury minutes to ascertain what evidence was presented to support the grand jury's finding of probable cause to believe the defendant committed the firearms offense charged, amounts to the same thing. Yet, the law is well-established that challenges to the sufficiency of the evidence presented to the grand jury are not permitted. *See, e.g., United States v. Williams*, 504 U.S. 36, 54–66 (1992) ("[I]t would run counter to the whole history of the grand jury institution' to permit an indictment to be challenged 'on the ground that there was inadequate or incompetent evidence before the grand jury.") (quoting *Costello v. United States*, 350 U.S. 359, 363–364 (1956)); *Bank of Nova Scotia*, 487 U.S. at 261 (explaining "a challenge to the reliability or competence of evidence presented to the grand jury" will not be heard, and "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment").

This law reflects "a long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts," *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681

(1958), and "a presumption of regularity," with respect to grand jury proceedings, "which generally may be dispelled only upon particularized proof of irregularities in the grand jury process," *United States v. Mechanik*, 475 U.S. 66, 75 (1986). Under Federal Rules of Criminal Procedure 6(e), grand jury materials are subject to disclosure when the defendant succeeds in carrying the heavy burden of showing "that a particularized need exists" that "outweighs the policy of secrecy." *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959) (internal quotation marks omitted); *see also id.* at 399 ("Petitioners concede, as they must, that any disclosure of grand jury minutes is covered by [FED. R. CRIM. P. 6(e)].") The Supreme Court has found this burden met where "the Government concedes that the importance of preserving the secrecy of the grand jury minutes is minimal and also admits the persuasiveness of the arguments advanced in favor of disclosure." *Dennis v. United States*, 384 U.S. 855, 871–72 (1966); *see also De Binder v. United States*, 292 F.2d 737, 739 (D.C. Cir. 1961) (determining that defendant met burden for inspection of grand jury minutes where "ample ground" existed for "suspicion" of "inconsistencies" between grand jury and trial testimony of prosecution's "sole, key, eyewitness").

By contrast, where a defendant fails to provide a discrete reason, and instead relies on speculation or unsupported assumptions, courts have made clear that disclosure of grand jury minutes is not warranted. *See, e.g., Procter & Gamble*, 356 U.S. at 682–83 (noting that defendants' showings "fall short of proof that without the [grand jury] transcript a defense would be greatly prejudiced or that without reference to it an injustice would be done," and thus the case was not one of those "cases of particularized need where the secrecy of the proceedings is lifted discretely and limitedly"); *Jackson v. United States*, 297 F.2d 195, 197–98 (D.C. Cir. 1961) (explaining, after finding "not the slightest evidence of inconsistency" between witness's

trial and grand jury testimony, that "[i]f defendant's position is correct . . . defense counsel in every case [might] be allowed to go upon a fishing expedition in the hope of developing something favorable to the defense"); *United States v. Borda*, 905 F. Supp. 2d 201, 205 (D.D.C. 2012) (finding defendants did not demonstrate particular need for inspection of grand jury minutes where their assertions about misleading evidence were "completely speculative" and relied on a "tenuous" connection between an affidavit and testimony presented to the grand jury); *United States v. Hernandez*, No. CR-14-0120 EMC, 2015 U.S. Dist. LEXIS 96402, at *29 (N.D. Cal. July 23, 2015) (finding, where "[i]ndictment is sufficiently factually specific," defendants have "no particularized need . . . to obtain the grand jury transcripts so that they can 'confirm' that the grand jury did not pass on the factual allegations the Government intends to prove at trial"). Only in "exceedingly rare cases" are defendants "able to make a factually based showing of particularized need for the production and inspection of grand jury materials." *United States v. Naegele*, 474 F. Supp. 2d 9, 10–11 (D.D.C. 2007) (allowing inspection of grand jury minutes because government misled the grand jury about the existence of a page of a document that had been the basis for "[a]t least five counts of the original eleven-count indictment").

In this case, Agustin contends that the grand jury minutes should be inspected to guard against any constructive amendment of the indictment stemming from variance between the evidence considered by the grand jury and the anticipated proof at trial. He speculates about "what evidence was presented to the grand jury" to raise "a very real possibility" that "constructive amendment of the Indictment" may occur. Def.'s Reply Mot. GJ Inspection at 1–2. While constructive amendment of an indictment violates the Fifth Amendment's presentment clause where substantial "variance" exists between the "charging terms of the indictment left unaltered" and "evidence offered at trial prov[ing] facts materially different from those alleged in

the indictment," *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C. Cir. 1969); *see also Stirone v. United States*, 361 U.S. 212, 218 (1960) ("[T]he basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for [an offense] which the grand jury did not charge."), Agustin has not presented any sufficient reason, let alone a particularized need, to overcome the presumption against disclosure of the grand jury materials.

Even if Agustin is correct that all of the evidence regarding the firearms charge that the government intends to introduce at trial was not presented to the grand jury, this does not amount to an improper variance of proof or demonstrate a particularized need for inspection of the evidence presented to the grand jury. As long as the defendant is on notice of the charges against him and the trial evidence does not alter "an essential element of the charge," the law permits some variance in proof between the grand jury and at trial. *United States v. Hitt*, 249 F.3d 1010, 1028 (D.C. Cir. 2001) (permitting "flexibility in proof" at trial, where "the defendant was given notice of the core of criminality to be proven at trial." (quoting *Berger*, 224 F.3d 107, 117 (2d. Cir. 2000)); *see United States v. Sitzmann*, 74 F. Supp. 3d 96, 122 (D.D.C. 2014) ("[W]here 'a generally framed indictment encompasses the specific legal theory or evidence used at trial, there is no constructive amendment.'") (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cr. 2007)); *accord United States v. Dowdell*, 595 F.3d 50, 68 (1st Cir. 2010) (explaining that, given notice of charge given to defendant, any "variance" in proof "would have been a harmless one" and not in violation of the Fifth Amendment); *United States v. Wiley*, 29 F.3d 345, 352 (8th Cir. 1994) (finding where defendant "was on notice before trial that the government intended to present" certain evidence, "any variance did not affect his substantial rights or cause actual prejudice"). For instance, "[t]here is no constructive amendment when a court 'admit[s]

evidence of other criminal conduct that is inextricably intertwined with the charged offense or that completes the story of the charged offense.'"  *McClurge v. United States*, No. 04 C 3628, 2004 U.S. Dist. LEXIS 25108, at *10 (N.D. Ill. Dec. 13, 2004) (alteration in original) (quoting *United States v. King*, 126 F.3d 987, 995 (7th Cir. 1997)).  Thus, to the extent Agustin is concerned that the government will present at trial other crimes or intrinsic evidence supporting Count Two that was not previously submitted to the grand jury, this additional proof does not amount to an improper variance and consequently does not warrant inspection of the grand jury minutes.

Given the adequate notice of the firearms charge afforded to the defendants, *see Apodaca II*, 2017 U.S. Dist. LEXIS 131617 at *66, and Agustin's failure to provide any actual "particularized need" for disclosure of grand jury materials, especially in light of his concession that cooperating witnesses may provide sufficient support for the charge against him, the first basis of his motion for inspection of grand jury minutes fails.

### B.  Alleged Improper Legal Instructions to Grand Jury

The second basis for Agustin's motion for *in camera* inspection of the grand jury minutes is to check whether the grand jury was properly instructed on the law regarding aiding and abetting liability.  In this regard, Agustin is correct that criminal liability for aiding and abetting a violation of 18 U.S.C. § 924(c) requires that the defendant has "actual knowledge" of the use of a firearm by the principal.  *See Rosemond v. United States*, 134 S. Ct. 1240, 1243 (2014) ("We hold that the Government makes its case by proving that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission."); *United States v. Slatten*, 865 F.3d 767, 793 (D.C. Cir.  2017) (citing *Rosemond*, and finding "sufficient evidence to support []

38

convictions under an aiding-and-abetting theory" where defendant at issue "actively participated in a gunbattle in which" victims were killed and "the gunfire of each shooter hindered potential escape, leaving victims exposed to the others' bullets"); *United States v. Powell*, 929 F.2d 724, 729 (D.C. Cir. 1991) (requiring proof that aider and abettor "knew to a practical certainty that his drug-peddling associates would be carrying a gun in connection with their joint venture"); *United States v. García-Ortiz*, 792 F.3d 184, 189–90 (1st Cir. 2015) (stating "requirement that an aider and abettor of a § 924(c) crime have advance knowledge of the principal's intent to use a weapon"). Citing a single paragraph in the prosecutor's extradition request, which Agustin claims provides an "incomplete statement of the law" applicable to aiding and abetting, he contends this provides "good reason to believe that any instructions [to the grand jury] were incomplete." Def.'s Mot. GJ Inspection at 7–8.

With this argument, Agustin again fails to meet his burden for demonstrating a "particularized need" to overcome the presumption of secrecy and regularity that materials from grand jury proceedings enjoy. *See Procter & Gamble*, 356 U.S. at 683; *Pittsburgh Plate Glass*, 360 U.S. at 400. His argument essentially relies on what is missing in the extradition request, which, as the government points out, is governed by treaty and does not require "a complete set of jury instructions." Gov't's' Opp'n Def.'s Mot. GJ Inspection at 7–8. Moreover, as discussed above, the indictment has already been deemed facially valid, which undermines Agustin's theory that the grand jury instructions may have been incomplete. *See United States v. Espy*, 23 F. Supp. 2d 1, 10 (D.D.C. 1998) (denying motion for disclosure of grand jury materials where "facially valid indictment undermines any 'particularized need' the alleged grand jury instructions demonstrate for disclosure of the grand jury transcripts"); *see also United States v. Singhal*, 876 F. Supp. 2d 82, 99 (D.D.C. 2012) (rejecting disclosure of grand jury materials

where "[d]efendants are unable to identify any portion of the Indictment that suggests that any charge to the grand jury was legally erroneous, and resorts to speculation about what the grand jury was instructed based on what is *not* stated in the Indictment") (emphasis in original); *United States v. Trie*, 23 F. Supp. 2d 55, 62 (D.D.C. 1998) (finding where "the indictment is facially valid" that "the mere suspicion that the grand jury may not have been properly instructed . . . is insufficient to establish that [the defendant] is entitled either to dismissal of the indictment or to disclosure of grand jury materials").

For these reasons, Agustin has failed to show any "particularized need" for inspection of the instructions to the grand jury about Count Two, and his attempt to relitigate his earlier challenge to this charge in the indictment must be rejected. Accordingly, Agustin's motion for an *in camera* review of the grand jury minutes is **DENIED.**

IV.     **CONCLUSION**

For the foregoing reasons, the following motions are **DENIED:** (1) the defendants' Motion to Suppress Title III Intercepts, ECF No. 33; (2) the defendants' motions to compel discovery, ECF Nos. 40, 41 and 45; and (3) Agustin's motion for *in camera* inspection of the grand jury minutes, ECF No. 130. The government's motion to use at trial transcripts of intercepted BlackBerry Messenger communications in the form produced to the defendants on August 8, 2017, ECF No. 95, is **GRANTED**, and, as explained *supra* in Part II, the parties must jointly submit, by **January 10, 2018**, a notice (1) detailing any outstanding disputes regarding the proposed transcripts produced on August 8, 2017; (2) whether any defendant intends to offer alternative transcripts; (3) if any defendant intends to offer alternative interpretations of the recordings, whether the parties intend to introduce one transcript containing both versions of the disputed portions of the recording or two separate transcripts; (4) the text of any requested

cautionary instructions regarding the transcripts; and (5) any objection to permitting the jury to use the transcripts during deliberations.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: December 28, 2017

_____
BERYL A. HOWELL
Chief Judge